Peter Poulet and Wife, plaintiffs in error, vs. Jacob Johnson and another, defendants in error.

[1.] "The oath of the party, stating his belief of the loss or destruction of the original, and that it is not in his possession, power or custody," is a sufficient foundation for the introduction of a second copy of such original.

[2.] Verbal admissions are legal evidence, to prove a trust resulting by implication of law.

[3.] Notice to a purchaser, that a particular person claims title to the thing about to be purchased, is sufficient, notwithstanding that the notice may not give the nature of the claim.

In Equity, from Richmond county. Decided by Judge Holt, April Term, 1857.

The object of the bill in this case was to obtain possession of a lot, in the city of Augusta, to which the plaintiffs set up claim, and which they allege has been inequitably withheld from them, by the defendants, and to have that full relief, which their case requires, and which a Court of Law cannot give.

It appears that, many years ago, the elder Cleon Nally, father of complainant, owned the lot now in controversy, and died in possession of it; that he was a man of small means, and left his estate incumbered with debt, and left, as his heirs, his widow and two children, one of whom died in infancy; that his widow, who continued to reside on the lot, took administration on his estate, and on the sixth of August, 1822, the lot was sold by the Sheriff of Richmond county, under an execution against Cleon Nally and one Lud Harris, and bid off by Philip H. Mantz; but the possession of the lot was not changed, after the sale, nor any title given by the Sheriff, until the third day of February, 1827, and the deed recorded 14th May; that in the mean time, to-wit: on the 8th day of December, 1824, Mrs. Nally, being about to enter into a marriage with James Johnson, father of the complainant, Jacob, an ante-nuptial contract was entered into, between the said James, and Freeman Walker and Philip H. Mantz, as trustees for Mrs. Nally, by which the said James agreed, upon the marriage being solemnized, to settle and assure to them, the said trustees, above named, their heirs or assigns, for the use of the said Mary Nally, and the heirs, now minors of Cleon Nally, deceased, all the right, title, interest, claim, or demand, which the said James Johnson, may, by the solemnization of the said intended marriage, acquire in any property, real or personal, now belonging to the estate of Cleon Nally, deceased, or to the said Mary Nally, individually: That the marriage was solemnized, and James Johnson and

Mary, his wife, continued in possession of said lot, residing thereon, until their death in the fall of 1839; and that complainant, Jacob, is the only issue of the marriage: That in 1835 or 6, application being made to Mantz, for the purchase of the lot, he said he could not sell it, as it belonged to Mrs. Johnson; that he had bought the lot, or advanced on it for Mrs. Johnson, and she still owed a small portion of that advance: That after the death of Johnson and wife, to-wit: in November 1839, Mantz rented the lot to a tenant, who wished to occupy it, but that the boys were in possession, and would not give it up: That Mantz told them they had better let it be rented out, and finish paying for it. He said he was their mother's trustee; had bought the lot, when sold for her husband's debts, and she still owed him about $65 for it: That Mantz was repeatedly heard to admit the lot to be Mrs. Johnson's property: That on the seventh day of May, 1844, the said lot, having been levied on by the Sheriff of the city of Augusta, as the property of Philip H. Mantz, was exposed to public sale, and bought by Mary T. Morrison, the highest bidder, for the sum of $305: That at that sale, public notice, in behalf of complainants, was given to the bidders, that the lot was not the property of Mantz, but belonged to the orphan children of Mary Johnson, and whoever bought it would buy a law-suit: That the property was at that time worth from $1,500 to $2,000; That, on the 13th February, 1846, Mary T. Morrison, for the same consideration, $305, conveyed the lot to Mary Mantz, widow of Philip H. Mantz: That in the year 1851, Mary Mantz, then Mary Henry, and her trustee, John D. Smith, sold and conveyed the lot to the defendant, Eliza, then Eliza Hackett, who had been informed that Jacob Johnson pretended to make some claim to the property, but was advised and believed the claim to be utterly groundless.

Upon the trial the complainant offered in evidence a copy, certified from the record in the Clerk's office of said Court, of an alleged marriage settlement, or ante-nuptial contract, between James Johnson and Mary Nally, both deceas-

ed ; which contract was dated, or purported to be dated, on the twenty-eighth of December eighteen hundred and twenty-four, and recorded on the first of February eighteen hundred and forty ; said record being made, some three months after both the parties to said alleged contract had departed this life.

The defendants objected to the admission of said copy in evidence, because, first, no evidence was offered of the existence of any such original paper; and secondly, if ever in existence, the original was not accounted for. Henry Johnson, half brother of James Johnson, deceased, who had the principal management of this suit, and the litigation preceding it, as next friend of his nephew, Jacob Johnson, one of the complainants, was then sworn : and stated that he never saw the original paper, and never made any particular search for it. That in order to find documents touching this case, he had examined the papers of the deceased James Johnson and wife, and a box of papers, found in the store of John D. Smith, in Augusta, said to belong to Philip H. Mantz, deceased, under whom the defendants claim title, and no such paper was found there. No other evidence was offered of the existence of the original, or by way of accounting for it. The Court admitted the copy to be read in evidence, the defendants objecting.

In the progress of the trial, three witnesses were offered— Garey F. Parish, William Little, William W. Lawrence, to prove the verbal admissions of Philip H. Mantz, in his lifetime, that this property belonged to Mary Johnson. To which defendants' counsel objected, as being inadmissible to show title to real estate. The Court admitted the evidence, as going to show Mantz's acceptance of the trust, under marriage contract.

The evidence of said Parish and Little, respectively, was objected to by defendants' counsel, on the ground that it provved a title, different from that set up in the bill : for that the bill claimed the property, under the ante-nuptial contract afore-

said, as part of the property of said Mary Nally, at the time of said contract, and the proof was that said Mantz admitted that he had bought the lot, for Mrs. Johnson; which objection the Court overruled, and admitted the testimony.

The Court charged the jury, that in order to recover, the Complainants must show that the property in question was intended to be included in the marriage contract, and that Mantz had accepted the trust; but that his acceptance might be shown by his acts and declarations, without writing; that the complainants' title must be derived, under said contract.

The Court also charged, that if Mantz held the property under the purchase of 1822, in his own right, it could not be included in the ante-nuptial contract; but if he held it for Mrs. Nally, it was so included.

The Court further charged, that if Eliza Hackett bought the property for value, without notice of any trust in Mantz, she could hold it; but that a notice of any claim, on the part of the complainants, was sufficient, without showing what was the character of the claim.

Under this charge, the jury found for the complainants.

Defendants counsel thereupon moved for a new trial on the following grounds.

I. Error of the Court, in this:

1st. In admitting in evidence, a copy of the alleged marriage contract of James Johnson, in prospect of his marriage with Mary Nally, without any evidence that the original ever existed, and without accounting for its non-production, if it ever did exist.

2d. In admitting parol evidence of title to real estate.

3d. In admitting Garey F. Parish and William Little, to prove the admission of Philip H. Mantz, under whom the defendants claimed title, made during his possession of the property in dispute, that he Mantz held the property for Mary Johnson; because the admissions were, that he had bought the lot for Mrs. Johnson, which showed a title, different from

that set up in the bill, which was a title as *cestui que trust*, in Mantz under the marriage settlement above referred to.

4th. In charging the jury, that if Mantz held the property under the sale of 1822, in trust for Mrs. Nally, the marriage settlement covered it, and it could be recovered in this proceeding.

5th. In charging the jury that a general notice of any claim to the property, on the part of the complainants, brought home to the defendant, then Eliza Hackett, before her purchase, deprived her of the rights of a *bona fide* purchaser for value; although it was no notice of the character of the claim, or of the equity set up in this bill.

II. Error of the jury, in this:

1st. That the verdict was against the charge of the Court, for the Court charged that a *bona fide* purchaser for value cannot be bound, by any secret trust of the person under whom he claims, unless notice of that trust is brought home to such purchaser. And no notice of any such trust was shown. Moreover, the Court charged that to entitle the claimant to a verdict, Mantz must be proven to have accepted the trust, under the marriage contract, and no such acceptance was shown. Moreover, the Court charged, that if Mantz held the property in his own right, under the sale of 1822, it could not be included in the settlement; and the evidence was that he did so hold it.

2d. That the verdict was contrary to the evidence in the case.

The Court below refused the motion for a new trial on all the grounds taken, and counsel for defendants excepted.

GOULD & SNEAD, for plaintiffs in error.

MILLERS & JACKSON, *contra.*

*By the Court.*—BENNING, J. delivering the opinion.

Was the Court below right in overruling the motion for a new trial? This is the question.

Poulet and wife vs. Johnson, et al.

The first ground of the motion, is in these words:

" I. *Error of the Court,* in this: 1. In admitting in evidence a copy of the alleged marriage contract of James Johnson, in prospect of marriage with Mary Nally, without any evidence that the original ever existed, and without accounting for its non-production, if it ever did exist."

[1.] The fifty second rule of Court is in these words: " Whenever a party wishes to introduce the copy of a deed or other instrument between the parties litigant, in evidence, the oath of the party, stating his belief of the loss or destruction, of the original, and that it is not in his possession, power, or custody, should be a sufficient foundation for the introduction of such secondary evidence."

In the present case, there was a waiver of the " oath of the party"—that is of the oath of Jacob Thompson, he " having been an infant, during most of the transactions."

This waiver of itself, must be considered as an admission, that he, if sworn, would have made the oath contemplated by the rule of Court.

The copy offered in evidence, was a copy taken from the record. That copy, therefore, was itself, some evidence that an original had existed.

It is true that to the admission of the copy, an objection was taken in *this* Court, that the instrument was not one entitled to record. But it is possible, that if this objection had been taken in the Court below, it might have been obviated in some mode; as, by the introduction of witnesses to the execution of the instrument. The objection, therefore, if otherwise good, came too late. *Harrison vs. Young,* 9, *Ga.* R. 359.

The common law is satisfied with "slight evidence" of the existence of the original writing, when secondary evidence of the execution of the writing is offered. 1 *Green. Ev. sec.* 558 ; 6 *Ga.* 194.

And ought not this to be so, as, it is the very object of the secondary evidence itself, to prove the execution, that is,

the *existence* of the original writing. When the showing is sufficient to satisfy the Court, that the party is not holding back primary evidence, the showing it would seem, ought to be considered sufficient to admit the secondary evidence.

We think, then, that there was, in what has been refered to, sufficient evidence, that the original had " *existed ;*" and, perhaps, also, a sufficient " accounting for its non-production."

There was however on the last point, further evidence, namely, the evidence of Henry Johnson, who had been the guardian *ad litem* in the case, for Jacob Johnson, before the latter became twenty-one years old. This evidence was, that though he had never seen the original, or " made any particular search" for it, "specially," yet, that he " had examined, (to find documents touching" the case,) " the papers of James Johnson and wife, deceased, and, a box of papers, found in the store of J. D. Smith, in Augusta, said to belong to P. H. Mantz;" and " that no such paper was found, in either place." Mantz was dead ; his wife had again married, and had remove from the State—having, previously to the marriage, made a marriage settlement, in which Smith was her trustee. It did not appear, that there was any representative of Mantz's estate. Under these circumstances, no further search was required. Henry Johnson had searched in every place in which, it was to be expected, that the paper might be found.

We think, then, the first ground of the motion, not sufficient.

The second ground of the motion, is in these words, " in admitting parol evidence of title to real estate."

The evidence here refered to, was the evidence of *Parish, Little* and *Lawrence.* We may take *Little's,* as a sample. It was as follows—"rented the lot of Mantz in November 1839, soon after Johnson's death. The boys were in possession, and would not give it up, Mantz told them, they had better let it be rented out, and finish paying for it. He said, he was their mother's trustee : had brought the lot, when sold

for her husband's debts, and she still owed him sixty-five dollars for it. Witness did not understand which husband he meant." There was evidence to show the lot to have been sold, for the first husband's debts, in 1822, and bought by Mantz; none, to show, that it had ever been sold for the last husband's debts. It may be presumed, that this renting of the lot by *Little*, finished paying Mantz for it.

Taking the above things to be true, they show that a trust in the lot *resulted by implication of law*, to Mrs. Nally, a trust in which, Mantz was the trustee; She the *cestui que trust*.

But trusts resulting by implication of law, are expressly excepted from the part of the statute of frauds, which requires " all declarations or creations of truts," to be " manifested and proved by some writing."

[2.] Such trusts, therefore, may still be manifested and proved, by matter not in writing.

We think, then, that there was nothing in the second ground of the motion.

The third ground of the motion, consisted also, in an objection to this same evidence of these same three witnesses, but an objection founded on a different reason; viz, the reason, that the admissions of Mantz, " showed," as it was insisted, " a title different from that set up in the bill, which was a title, as *cestui que trust* of Mantz, under the marriage settlement."

The title set up in the bill, was a title under the marriage articles. Those were dated in 1824. By them, Johnson, the husband they contemplated, agreed to settle on trustees for Mrs. Nally, the wife they contemplated, and for her two children, " all the right, title, interest, claim, or demand, which the said James Johnson" might, " by the solemnization of said intended marriage, acquire in any property, real or personal," then " belonging to the estate of Cleon Nally, deceased, or to said Mary Nally individually."

Now the admissions of Mantz, showed a resulting trust in Mrs. Mary Nally, commencing in 1822; for the buying of

the lot for her by him, happened in that year. The admissions, then, showed, that this trust was a part of Mrs. Nally's " right, title, interest, claim or demand," *covered by the articles.*

The admissions, "therefore went to prove the very title set up by the bill; they went to prove that the lot was a part of the property had in contemplation by the articles, which themselves failed to specify what particular property they did have in contemplation.

It is true, that the admissions might also serve to show, an independent trust in Mantz, one that would exist if there had been no articles at all, but yet, this does not prove, that they could not show, that that trust was intended to be one of the things contemplated by the articles.

This third ground, then, is we think, not true in point of fact.

The fourth ground merely presents this same question, in another form.

The Court charged the jury, "*that a notice*" *(to* Eliza Hackett) "of any claim on the part of the complainants, was sufficient, without showing what was the character of the claim."

This charge is made the fifth ground of the motion.

[3.] The charge, we think, was right. Such a notice was sufficient to require Miss Hackett to enquire of the *complainants* what was the nature of their title. And any notice requiring that of a purchaser, is a good notice. 1 *Stor. Eq. sec.* 400.

The next ground of the motion, was this; " that the verdict was against the charge of the Court, for the Court charged, that a *bona fide* purchaser for value, cannot be bound by any secret trust of the person under whom he claims, unless notice of that trust is brought home to such purchaser. And no notice of any such trust was shown. Moreover, the Court charged, that to entitle the claimant to a verdict, Mantz must be proven to have accepted the trust under the marriage con-

tract, and no such acceptance was shown. Moreover, the Court charged, that if Mantz held the property in his own right, under the sale of 1822, it could not be included in the settlement; and the evidence was, that he did so hold it."

As to the first of these three specifications.

It is not true, that "no notice of any such trust was shown." The answer admits, that Miss Hackett "had been informed that Jacob Johnson pretended to make some claim to the property." True, the answer also says, that she "was advised and believed it to be utterly groundless." But why did she not enquire of Jacob Johnson? He could have told her better, and he, of all persons, was the one to enquire of.

Then, Parish told her "the title was doubtful. She answered, that William T. Gould had advised her the title was good." This may mean, that she knew what Johnson's title was, and that, having legal advice on it, she considered it worthless.

Then, the property continued in the possession of Mr. & Mrs. Johnson, from their marriage in 1824, to their death in 1839. It was never in the possession of P. H. Mantz, except as Mrs. Johnson's *administrator*. The slightest enquiry by Miss. Hackett of Jacob Johnson in reference to his claim, would, probably, have put her in possession of this great fact.

As to the second of these specificiations.

There *was* evidence going to show, that Mantz had "accepted the trust under the marriage contract." *Little* heard him tell "the boys," (the complaints,) that "he was their mother's trustee." What did he mean by this? That he was trustee by the *resulting trust* aforesaid, or trustee by the *marriage articles*? The jury might well infer, that he meant the latter, not being a lawyer, is it likely, that he ever knew, that there was such a thing as a resulting trust.

As to the last of these specifications.

It is not true, as we think, that the evidence was, that Mantz held the property in his own right. The evidence,

as we think, shows that Mantz held the property in trust for Mrs. Johnson and her two Nally children, a trust resulting by implication of law, from his having purchased the property for her, and having been reimbursed by her, the money paid out by him in the purchase.

The last ground of the motion, was, that the verdict was contrary to the evidence.

We think, that the verdict was not contrary to the evidence.

The result is, that we think, the judgment right, overruling the motion for a new trial.

Judgment affirmed.