DODGE *v.* BRIGGS and others.

(*Circuit Court, S. D. Georgia, W. D.* March 22, 1886.)

1. PRINCIPAL AND AGENT — TITLE OF AGENT TO LAND PURCHASED FOR JOINT-STOCK COMPANY.

Where the agents of a joint-stock company buy lands for it; pay the purchase money with the company's funds; always declare that such lands belong to the company; represent themselves always as the agents of the company in the management of the lands; take their salaries as such; and never claim such lands as their own, although the deeds were taken in their names, —they took no title as individuals, but the title was in the company.

2. SAME—RIGHTS OF HEIRS OF AGENT.

The heirs of such agents, as to this title, occupy no position superior to that of their ancestors; they take no title, because their ancestors had none.

3. VENDOR AND VENDEE—ADMISSION AGAINST TITLE BY FORMER OWNER.

A party deriving title from another, mediately or immediately, is bound by the admissions against that title made by the latter while the title is in him. When such admissions so made are clear and uncontradicted, they are conclusive.

4. SAME—NO TITLE IN VENDOR—BONA FIDE PURCHASER.

The doctrine of *bona fide* purchaser without notice does not apply where there is a total absence of title in the vendor. The good faith of a purchaser cannot create a title where none exists.

5. DEED—FAILURE TO RECORD—PRIORITY—SUBSEQUENT CONVEYANCE.

On a failure to record a deed within time, a subsequent deed, taken with-

out notice of the first, and properly recorded, has priority; but such deed must be from the same vendor, and a deed from the heir of the vendor has no such priority.

6. SAME—QUITCLAIM DEED—NOTICE.

The doctrine of *bona fide* purchaser without notice does not apply to conveyances made by quitclaim deeds.

7. VENDOR AND VENDEE—TENDER OF QUITCLAIM.

Where a quitclaim deed is tendered by the apparent owner to one contemplating the purchase of land, it is a fact sufficient to awaken the suspicion of the latter as to the validity of the title, and to put him on inquiry, and he is chargeable with notice of such defect of title, as he might readily have ascertained on inquiry.

8. EQUITY JURISDICTION—MULTIPLICITY OF SUITS—CLOUD ON TITLE.

A court of equity has jurisdiction to prevent fraudulent and irreparable injury, where a great multiplicity of suits will be avoided, and when it is necessary to remove a cloud from the title to lands. Especially is this true, where the object of the bill is to declare and enforce a trust against a multitude of respondents who are claiming under one fraudulent title.

9. SAME—RELIEF ALLOWED—FRAUD.

While it is true that in all proceedings to enforce the title to land the complainant must rely on the strength of his own title, it is also true, where the respondents have been guilty of such fraud as would defeat the complainant or his legal title, he may, in equity, with suitable allegations, and with sufficient proof, supply such defect in his legal title as their fraud has created. His equitable right, with such satisfactory proof of their fraud, is equivalent to the legal title.

10. EVIDENCE—ANCIENT DEED.

A deed more than 30 years of age, which has been acted upon, and under which the purchaser took possession, is admissible without proof of execution; and an ancient record, coming from the proper custody, corroborated by proof that it was a part of the actual transfer of the property therein mentioned, is admissible.

11. STATE—RIGHT TO LANDS PURCHASED IN ANOTHER STATE.

While the comity which exists between the states of the Union will not necessarily legalize the purchase and the possession by one state of lands in another state, still such comity would support such a transfer, for value, as would prevent a sister state from loss; and, in the absence of any proceeding to vitiate the title, in this case it will be presumed that the state of Indiana took the lands for a legitimate purpose, and with permission of the state of Georgia, and the respondents have no right to raise this question.

In Equity.
*Lanier & Anderson* and *R. K. Hines,* for complainant.
*Luther A. Hall* and *Hill & Harris,* for defendants.

SPEER, J. There is involved in this controversy the title to 300,-000 acres of land. The lands are heavily timbered with yellow pine, and derive their chief value from that fact. They are of the alleged value of $150,000, but this is probably a very low estimate of their value. They lie in the counties of Telfair, Dodge, Pulaski, and Laurens. The cause came on for a final hearing in November last, and the arguments of counsel exhibited great ability and research, ample preparation, and unusual force and precision of statement. Because of the importance and difficulty of the issues involved, and the multitude of questions arising in the consideration of the record, I have, until now, been unable to reach a satisfactory conclusion; and while

v.27f.no.2—11

regretting this delay, I have deemed it proper to take the time, and carefully to test, in the light of principle and authority, the results of my examination.

The bill is filed by George C. Dodge, a citizen of the state of New York, against Luther A. Hall, Oliver H. Briggs, and H. G. Sleeper, who are alleged to be operating under the firm name of Sleeper, Hall & Briggs, in Dodge county, and against many other parties in this district, who are alleged to be trespassers on various parcels of the land. The respondents are citizens of Georgia, and of the several counties in which the land is situated, save the heirs of Colby, Chase, and Crocker, to whom more explicit reference will be made,—these are non-residents.

The complainant alleges that he is the owner of the lands in controversy; that his title is traceable through a period of half a century, and originates in grants from the state of Georgia. The taxes have been uniformly paid. There are 1,500 separate lots. The lands belong to that class termed "wild lands." Being unoccupied and uncultivated, and widely dispersed in five counties, it is impossible, without extraordinary expense, to protect them from depredation. From this cause complainant states that he has already suffered heavily. Complainant further avers that about a year previous to the filing of the bill the respondents Oliver H. Briggs, Luther A. Hall, and H. G. Sleeper concocted a plan to deprive him of the use and enjoyment of his lands. They surreptitiously ascertained the fact that one of his deeds, viz., a deed from Stephen Chase, Abraham Colby, and Samuel C. Crocker had been defectively executed, as they suppose; that Briggs, Hall & Sleeper quietly went to work and procured powers of attorney from the heirs at law of Colby, Chase, and Crocker, who are named in the bill, under which power of attorney the three alleged conspirators have assumed the right to sell and lease the said lands, and to dispose of the timber; that Luther A. Hall, one of the alleged conspirators, is an attorney at law, but that he has combined and conspired with the others for the use and benefit of the three, and their compensation depends upon the success of their project; that Briggs, Hall & Sleeper are actively engaged in promoting and encouraging trespassers on these lands; that they sell to ignorant and innocent persons lots of the land, and sell the timber, and lease tracts of timbered land for turpentine farms; they represent that complainant has no title to the land. These wrongs have seriously injured the complainant. Moreover, the alleged conspirators, by interviews and publications in the newspapers, and by their sedulous activity in slandering the title of the complainant, have deprived him of the ability to sell these lands; that these damages are irreparable on account of the insolvency of Briggs, Hall & Sleeper, and their confederates. All of the other alleged trespassers, with one or two exceptions, are likewise insolvent, or beyond the jurisdiction of the courts.

The remaining allegations of the bill are, substantially, as follows: In the year 1833 a number of persons in the state of Maine, conceiving it a profitable enterprise, organized a stock company known as the Georgia Lumber Company. Their object was to purchase tracts of heavily-timbered pine lands in Georgia; to send down the skillful lumbermen from the pine forests of Maine to build saw-mills; and to develop, at that early day, what has since proven to be a valuable and lucrative resource of the state,—its timber interest. Before incorporation it was called the Georgia Land Company; afterwards the Georgia Lumber Company. Stephen Chase, Abraham Colby, and Samuel E. Crocker were commissioned as its agents to go to Georgia, and to make purchases of lands for the company. The agents performed this service, and purchased the lands, in the year 1834, from Peter J. Williams, of Baldwin county. The charter of the Georgia Lumber Company was procured in Georgia in 1834 by Stephen Chase; that Colby, Chase, and Crocker acted in the state of Georgia as the agents of the company, and uniformly represented themselves as such, and never set up any claim to these lands in their own right. Afterwards, 18,000 acres of the land was purchased in the same manner, and by the same agents, from Josiah Flournoy. Colby, Chase, and Crocker are all dead, and for many years. Their heirs never claimed the lands until they were induced to make the power of attorney to Briggs, Hall & Sleeper; and but for the fraudulent representation of these alleged conspirators, for their own selfish purposes, no such claim would ever have been interposed. The deed from Peter J. Williams to Stephen Chase, Abraham Colby, and Samuel E. Crocker was by mistake made to them in their individual names, but not as agents of the Georgia Land or Lumber Company. Complainant further charges that Briggs, Hall & Sleeper are proceeding to make a number of contracts for lots of land lying in different counties, and with a large number of persons, which will involve him in multiplicity of suits to protect his interest; that Briggs, Hall & Sleeper are not recording these contracts, but are concealing them from complainant; and that the parties with whom they are contracting are building shanties and cutting timber on his lands, to his great and irreparable injury. Complainant alleges that he has no adequate remedy at law; and prays that the defendants, all discovery being waived, shall be held to account for the rents and profits of the lands which they have appropriated to their own use, and for all damages; that the contracts, leases, powers of attorney, and other instruments of writing may be delivered up and canceled, in order to remove the cloud from the title of complainant; that Briggs, Hall & Sleeper, and their agents, be enjoined from further interfering with the lands, and from making sales, leases, and contracts of any description thereto; and that the alleged heirs at law of Colby, Chase, and Crocker be likewise enjoined; and that the numerous trespassers be enjoined from further trespassing on or using said lands for their own purposes, in any manner.

On the nineteenth of January, 1885, an amendment to the bill was filed, locating the residence of the several heirs at law of Colby, Chase, and Crocker, and praying that they be made parties. It charges, further, that since the filing of the original bill these alleged heirs, with full knowledge of his title, made conveyance of all of said lands to one Silas P. Butler, a resident of the state of Massachusetts; these are quitclaim deeds, but there was no record of these deeds, or any attempt to record them, until after the bill was filed; that these conveyances were part of the scheme to defraud the complainant; that while purporting to be in consideration of the sum of $300,000, that no such consideration passed; that Silas P. Butler is a person of no responsibility, but is an employe of John L. Colby, one of the heirs at law. It is prayed that Butler, and all of said heirs, be perpetually enjoined from claiming or setting up any title to the lands in controversy.

Briggs, Hall & Sleeper file a joint answer. They deny all combination. They say that the complainant never was the legal owner of said lands, and that no legal title has ever passed to him. They say that the deed purporting to have been made by Colby, Chase, and Crocker to the Georgia Lumber Company conveyed no title; that the charter of the Georgia Lumber Company is unconstitutional. They say, further, that the conveyance made by the corporation to the state of Indiana, and the deed of the state of Indiana to Martin R. Green, are void. They admit that under powers of attorney from the heirs of Colby, Chase, and Crocker they have sold and leased many of the lots of land mentioned in complainant's bill, but their action is fair, honest, and legal. They say, in November, 1883, the entire interest of the heirs whom they represent was sold to Silas P. Butler, of the state of Massachusetts, and that they now represent Butler as his agents and his attorneys at law. They deny their insolvency. They say that they have reason to believe that Stephen Chase, Abraham Colby, and Samuel E. Crocker own said land individually, as they purchased the same for their individual benefit, and in their individual names, and not as agents and trustees for any one. They deny that Colby, Chase, and Crocker represented themselves to be agents of the Georgia Lumber Company. They deny all manner of fraud or concealment.

Silas P. Butler, by plea, sets up the same facts as were set up in the answer by Briggs, Hall & Sleeper. He also files an answer, averring that Colby, Chase, and Crocker had title to these lands, and that he bought in good faith from their heirs. He avers that he bought in good faith, and for the consideration mentioned in the deeds, to-wit, $300,000. He does not notice in his answer the charge that he was a mere employe of Colby, one of the heirs against whom the bill is filed.

Several of the respondents answer that they do not claim title under the heirs of Colby, Chase, and Crocker, and they put in evidence

the deeds under which they claim, which show an independent title to the lots therein described. All the other answers follow substantially that filed by Briggs, Hall & Sleeper.

Among other evidence, the complainant introduced the following chain of title: Plats and grants from the state of Georgia to Peter J. Williams, John Mitchell, George L. Deming, and Samuel Rockwell to all the lands in dispute in the bill; deed, George L. Deming to P. J. Williams, dated January 3, 1834; deed, John Mitchell to P. J. Williams, dated first January, 1834; deed, S. Rockwell to P. J. Williams, dated first January, 1834; copy and exemplification of last will and testament of Peter J. Williams; exemplified copy of the laws of the state of New York authorizing the formation of corporations; charter of the Georgia Land & Lumber Company, under the laws of the state of New York; deeds, (three,) Peter J. Williams (certified copy) to Stephen Chase, Abraham Colby, and Samuel E. Crocker, dated February 28, 1834, as recorded in Telfair, Pulaski, and Montgomery counties; certified copies of a deed from Stephen Chase, Abraham Colby, and Samuel E. Crocker to the Georgia Lumber Company, dated fifth January, 1835, being one copy each from the records of the counties of Laurens, Pulaski, Telfair, and Montgomery, Georgia; act of legislature of Georgia, approved December 17, 1834, incorporating Georgia Lumber Company; certified copies of deed from Georgia Lumber Company to the state of Indiana, dated twenty-fourth September, 1842; exemplified copy of a joint resolution of the general assembly of the state of Indiana, authorizing the governor or agent of state to sell lands in Georgia, approved January 16, 1849; certified copies of deed, Paris C. Dunning, governor of the state of Indiana, to Martin R. Green, dated first December, 1849; exemplified copy of an act of the general assembly of the state of Indiana, confirming the sale of lands in Georgia, to Martin R. Green, approved February 12, 1851; a regular chain of title from Martin R. Green to complainant.

It is clear from the voluminous evidence introduced on the trial that Peter J. Williams originally owned these lands; Colby, Chase, and Crocker bought from him; and the first question to be determined is, did they buy for themselves, or did they buy for the Georgia Lumber Company, projected and organized in Maine, 50 years ago?

On a review of the evidence, it is impossible to doubt the agency of these parties. Chase admitted that he, Colby, and Crocker were the agents appointed by the Georgia Lumber Company to buy these lands, and that they bought of Peter J. Williams. Chase is long ago dead, but before his death he became involved in litigation in Maine, and his sworn answer, there filed of record, not only sets up his agency, but there is attached as exhibits the original articles by which the Georgia Lumber Company was formed, and the resolution of the stockholders, and their letters appointing himself, Colby, and Crocker as the agents to make this purchase. It also appeared that, for several

years thereafter, Chase, Colby, and Crocker were the officers of the company; and an account is in evidence, rendered to the company by them, showing the charge made for services and traveling expenses; and, besides, there is evidence of witnesses still living which indisputably proves their agency. Their extensive correspondence with the company and with each other shows this also.

It is true that the deeds were made to them as if in their own right; but their contemporaneous letter to the company, and the overwhelming array of facts produced by the complainant, leads the mind irresistibly to the conclusion that they bought the lands for the company. They represented themselves as the agents of the company, and never, while living, so far as the evidence discloses, pretended that the lands were bought for themselves. How is it possible for the heirs of Colby; for instance, to avoid the effect of the statement of account in the proven handwriting of their ancestor, reading:

*Georgia Lumber Company, Debtor, to A. Colby:*

November 9, 1839.   For services as agent, 18 months, - - $1,000 00
"     9, 1839.   For expenses,     -     -     -     -     400 00

This is but one of numerous *indicia* unmistakably pointing to the existence of their agency.

Notwithstanding the fact of the mistake of the scrivener who drew the deeds, it is the duty of the court to regard Colby, Chase, and Crocker as standing in the attitude in which they place themselves by their admissions, and in which they are placed by the uncontradicted evidence of witnesses,—the cumulative testimony of sworn records given that force springing from the oath of a party testifying against his own interests.

Now, certainly, the heirs of Colby, Chase, and Crocker can occupy no position in this contest superior to that occupied by their ancestors. They take no title, because their ancestors had none. They are incumbered by all of the admissions made by their ancestors. *Wood* v. *McGuire,* 17 Ga. 303; *Same* v. *Same,* 15 Ga. 202. A party deriving a title from another, mediately or immediately, is bound by admissions against that title made by the latter while the title is in him. When such admissions so made are clear and uncontradicted, they are conclusive. This is the law as settled by the supreme court of this state, whose decision is paramount as to this question.

Now, Silas P. Butler is a purchaser from the heirs at law. He buys nothing which they did not possess, he occupies no better position than they do. They having no title, he buys none. A purchaser from the heir at law is in no better position than the heir from whom he purchased. The doctrine of *bona fide* purchaser without notice does not apply where the purchaser buys no title at all. If he buys from one who has title, and it should afterwards appear that another had a better title which he had not recorded, or that there was a fraud in the title of which he had no notice, the purchaser would be protected. But this doctrine cannot apply where no title whatever

existed in the vendor. The good faith of a purchaser cannot create a title. The heir inherits that property only to which his ancestor was entitled, and it follows, therefore, that a conveyance from the heir at law, to lands to which the ancestor had no title, is no better than a deed from a perfect stranger.

It is contended, however, that Silas P. Butler, having purchased from the heirs at law of Colby, Chase, and Crocker, may take advantage of the fact that the deed of Colby, Chase, and Crocker to the Georgia Lumber Company was not recorded. Assuming, for the sake of the argument, that Butler bought in good faith, and without notice, —a very violent assumption, as we shall presently see,—he must, nevertheless, make it appear that he purchased from one who had title. The deed from Colby, Chase, and Crocker to the Georgia Lumber Company is not, in equity, at all essential to the validity of the company's title. It is, in fact, nothing more than a supplementary admission of their agency. Their admissions previously and subsequently to the execution of the deed, and uniformly made, are equivalent to a link in the chain of the company's title. If this were not true, to enable Silas P. Butler to take advantage of the fact that the deed from Colby, Chase, and Crocker to the company was not recorded, he must have a subsequent deed from Colby, Chase, and Crocker themselves. He cannot rely on a recorded deed from their heirs at law. The unrecorded deed of the ancestor would divest the title of the heir. He does not occupy the same position as the subsequent purchaser; he is a mere volunteer.

Code Ga. § 2705, provides "that, on failure to record a deed within time, the record may be made at any time thereafter; but such a deed loses its priority over a subsequent deed from the *same vendor*, rendered in time, and taken without notice of the existence of the first." The words " same vendor " cannot be construed to mean the heir of the vendor. He, like his ancestor, would be divested of title by the unrecorded deed. *Webb* v. *Wilcher*, 33 Ga. 565.

In *Hill* v. *Meeker*, 24 Conn. 211, it is held: "A deed of land, not recorded until after the death of the grantor, is valid against the purchaser from his heir at law, although such purchaser has no knowledge of the existence of the deed." See, also, *Hancock* v. *Beverly's Heirs*, 6 B. Mon. 531.

It may also be observed that Butler, as to part of these lands, took a quitclaim deed from the heirs of Colby, Chase, and Crocker. Subsequently to the conveyances by quitclaim deed they made him deeds of warranty. To conveyances by quitclaim deed the doctrine of *bona fide* purchaser without notice does not apply. *Woodward* v. *Jewell*, 25 Fed. Rep. 691; *Villa* v. *Rodriguez*, 12 Wall. 323; *Dickerson* v. *Colgrove*, 100 U. S. 578. And the fact that a quitclaim deed was offered him was sufficient to awaken his suspicions as to the validity of the title,—to make him inquire,—and he is chargeable with notice of such invalidity of title in the heirs of Colby, Chase, and Crocker

as he might have ascertained by inquiry.   Adams, Eq. 158; Story, Eq. Jur. 399, 400; *Cummins* v. *Boston*, 25 Ga. 284; *Bryant* v. *Booze*, 55 Ga. 438; Wade, Notice, 10 *et seq.; Le Neve* v. *Le Neve*, 2 Lead. Cas. Eq. 109.

He was also shown the will of Stephen Chase, which will makes no reference to any lands in the state of Georgia.   This fact in itself is sufficient to put a prudent man, who contemplates the purchase of 100,000 acres of land in Georgia, from the heirs of Chase, upon inquiry as to its title.   The truth is, Butler, Briggs, Hall, and Sleeper, and the heirs of Colby, Chase, and Crocker, are mere interlopers. They are not *bona fide* claimants of this land.

It is charged in the amended bill that Butler is a mere clerk of Colby.   He does not deny this in his answer; and while this does not amount to evidence, it is a suspicious circumstance.   Can it be possible that a mere clerk in the office of Colby is able to pay $300,-000 for a tract of land?   His answer is evasive, trifling, and it may be doubted whether it was sworn to.   No man possessing sufficient intelligence to comprehend his rights would be content to rest his claim to property so valuable upon an answer so trifling and evasive in its character.

Another circumstance will show how fraudulent is the participation of Butler in this scheme.   The power of attorney under which Briggs, Hall & Sleeper act was made in November, 1883, and yet Butler, this clerk of one of the men who gave the power of attorney, purchased the land in less than three weeks, at the pretended price of $300,000, and yet Briggs, Hall & Sleeper say in their answer, acting under this power of attorney, they have sold and leased divers of the lots mentioned in complainant's bill, to sundry and divers parties. Nevertheless, the whole tract is afterwards sold to Silas P. Butler, making no mention in his deed of the sales to "sundry and divers innocent purchasers" in Georgia.   Briggs, Hall & Sleeper further say "their action in the premises has been open and above-board,"—"fair, honest, and legal;" and these "fair, honest, and legal representatives" sold these lands twice,—first to innocent purchasers in Georgia, and then to Silas P. Butler.   They cannot contend that after Butler's purchase these sales to the Georgia purchasers were made, for they distinctly affirm that they have made no sale since the twenty-sixth of December, 1883, at which time Butler's purchase was completed.

According to their answer, there are more than 50 citizens of Georgia who have bought and leased from Briggs, Hall & Sleeper various lots of these lands.   Notwithstanding this fact, the entire tract of 300,000 acres, at one fell swoop, is conveyed to Butler, without any mention in his deeds of the Georgia purchasers.   The degree of sincerity, honesty, and legality in the transaction may be easily estimated from this circumstance.

It is insisted, however, by the respondents, that we have no jurisdiction, in a court of equity, to grant the relief prayed for, for the

reason that the complainant has an adequate remedy at law, the suit being in the nature of an action in ejectment. I think the equitable jurisdiction is clearly maintainable. This is not a bill to recover possession of lands, as in an action of ejectment, but it is to prevent fraudulent interference and irreparable injury to the lands and title of the complainant. The authorities relied on by respondents' counsel are not applicable. In the case of *Hipp* v. *Babin*, 19 How. 271, the title was merely legal. There was no multiplicity of suits; no other special ground of equity jurisdiction; and no particular reason why the court should maintain it. The case in 15 Wall. was to enjoin a suit on a bond on the allegation that the bond was issued without authority. This would have been a complete defense at law. The case in 23 Wall. 466, (*Lewis* v. *Cocks*,) would expressly justify intervention by equity, where the fraud of the agents or their representatives is so glaring as in this case, it being incontestably true that Colby, Chase, and Crocker bought the lands for the citizens of Maine, who were the incorporators of the Georgia Land & Lumber Company, and paid for it with the money of the company, whatever may be the apparent validity of the title they or their heirs, or those holding and claiming under them, may have. To declare and enforce this trust is within the power of a court of equity. Story, Eq. Jur. 120. Besides, the complainant may appeal to that court to remove a cloud from his title, and to prevent a multiplicity of suits, and the great expense and inconvenience of the litigation necessitated by the multitude of defendants claiming under the same title. *Oelrichs* v. *Spain*, 15 Wall. 211; *Chastian* v. *Smith*, 30 Ga. 96; *McKinney* v. *Burns*, 31 Ga. 295; *Scott* v. *Taylor*, 64 Ga. 508; *Poulet* v. *Johnson*, 25 Ga. 403; *Stark* v. *Starr*, 94 U. S. 477, 485–492.

It is further insisted that complainant must recover on the strength of his own title, and not on the weakness of the title of the respondents. While this is true, it is also true that if the respondents, or the persons under whom they claim, have been guilty of such fraud as would defeat the complainant on his legal title, he may, in a court of equity, on a bill filed against respondents, by suitable proof, supply such defect in his legal title as their fraud has created. His equitable right, with such satisfactory proof of their fraud, then becomes, in contemplation of the court of equity, the legal title.

A conveyance is claimed from Butler, who is the fraudulent reservoir of all the alleged titles flowing from the use which Briggs, Hall & Sleeper have made of the imperfect execution of their trust by Colby, Chase, and Crocker. The admissions of Colby, Chase, and Crocker, and the clear proof of their agency, constitute a sufficient link in the chain of complainant's title, and, in the breast of a court of conscience, this evidence adequately and amply supplies the defects in the written title which are sought to be utilized for the fraudulent purposes of Briggs, Hall & Sleeper, and their confederates.

It is also insisted that the deed to Colby, Chase, and Crocker is

not admissible, because it was not properly registered, and *Beverly* v. *McBride*, 9 Ga. 443, is cited in support of this objection. Now, the deed in the case before the court is more than 30 years of age, and in the authorities cited the chief justice, in delivering the opinion of the court, uses this language:

"Had this instrument been thirty years old, and testimony adduced that it had been acted upon, or that the obligee took possession of the premises in dispute under it, no proof of its execution would have been required."

In *Hearn* v. *Smith*, 59 Ga. 704, also cited, the deed was not 30 years old.

In submitting proof of complainant's title the fact was developed that the state of Indiana once owned all of these lands. It was stated in the argument that the Georgia Lumber Company had borrowed money from the old Bank of the United States, and gave the bank a mortgage on these Georgia lands as security for the debt. In the distribution of the assets of the bank on its dissolution, the state of Indiana became the owner of the mortgage, and the Georgia Lumber Company, by deed to that state, discharged the debt, and conveyed to it the title. Whether this account be historically true or not, it matters not. The fact is evident that a conveyance was made of the lands in dispute from the Georgia Lumber Company to the state of Indiana. This conveyance is attacked by respondents on two grounds—*First*, that the deed was not properly executed and proven; *second*, that the state of Indiana is inhibited from holding lands in the state of Georgia.

The technical ground of objection is that the deed had but one witness. He was, however, a commissioner of deeds for the state of Georgia, residing in the state of Indiana. The original deed having been lost, was not offered, but a copy taken from the record, and it was insisted that, there being but one witness, the deed could not be admitted to record. It was an ancient record, and it is true that an ancient record, like an ancient deed, is admitted in evidence without proof. After the lapse of 30 years the law presumes that the official who made the record is dead, and that he cannot be summoned to explain the circumstances under which he made it, and it presumes that everything was done which ought to have been done. If the paper appears to be formally a deed, admitted to record on the attestation of one witness, where two witnesses were required by law, after the lapse of 30 years it will be presumed that there were two witnesses, and that the clerk omitted one. This rule of evidence is enforced *ex necessitate rei*. As in other rules of evidence it is made to further the ascertainment of truth. In this case there is a strong presumption that the deed was never fabricated, and that it was acted upon. It was made to a great state. There is nothing suspicious about it. "An ancient deed, by which is meant one which is more than 30 years old, having nothing suspicious about it, is presumed to be genuine without express proof, the witness

being presumed dead; and if it is found in the proper custody, and is corroborated by ancient or modern corresponding enjoyment, or by other equivalent or explanatory proof, it is to be presumed that the deed constituted part of the actual transfer of the property therein mentioned; because this is the usual and ordinary course of such transactions among men. The residue of the transaction may be as unerringly inferred from the existence of genuine ancient documents as the remainder of a statue may be made out from an existing *torso*, or a perfect skeleton from the fossil remains of a part." 1 Greenl. Ev. 144; *Webb* v. *Wilcher*, 33 Ga. 565; *Adams* v. *Roberts*, 2 How. 496; *Patterson* v. *Winn*, 5 Pet. 233; *Winn* v. *Patterson*, 9 Pet. 663. The two decisions last cited are pronounced by Mr. Justice STORY, and are cases from this circuit.

The deed is corroborated by a resolution of the legislature of Indiana, authorizing the sale of this property by a deed of the governor of Indiana conveying the same. The deed, therefore, constituted part of the actual transfer of the property therein mentioned.

It is said, however, that the state of Indiana cannot own lands in Georgia. The right of a state to hold lands in another state has never been expressly decided. It has been held that the government of the United States cannot accept a legacy to lands in a state, and that such legacy is void. *U. S.* v. *Fox*, 94 U. S. 315. It is said, and with great show of reason, that it is abnormal, and contrary to public policy, that a state should be permitted to hold lands in another state; and it is also said that a state can own nothing that is not necessary to its existence, and the proper conduct of its affairs.

With regard to the last ground of objection, it can be replied that a state has many of the powers of a private corporation, and I do not see why a state may not buy lands as well as bonds. Most unquestionably is it true that the state of Indiana could not hold lands in the state of Georgia if the state of Georgia objected to it. Our fathers, however, were competent to deal with this question. Their ideas of state sovereignty were even more pronounced than those which now obtain. It is not disclosed by the record that they objected to this effort on the part of a sister state to save what, presumably, was a bad debt. A transaction so enormous as this could not have escaped their attention, and it is scarcely appropriate, I think, in the absence of any action by the state, for Messrs. Briggs, Hall & Sleeper, at this late date, to bring forward the question of its offended sovereignty, especially as it appears that their patriotism, not altogether disinterested in itself, would result in robbing the citizen of another state.

An alien may hold lands in Georgia, and while the comity which exists between the states of our Union will not, in my judgment, legalize the purchase and possession of lands by one state in another state, as a general proposition, still it will permit a state of the Union to authorize or tacitly sanction such a transfer of the title to lands

in its territory to a sister state as will prevent the latter from loss. In order to vitiate the title of the state of Indiana, some proceeding in the nature of "Office found" must have been adopted. It must be understood also that when the state of Indiana bought these lands it came as a subject, and not as a sovereign. It is to be presumed that the state of Indiana got the lands for a legitimate purpose. It is to be further presumed that the state of Georgia would have objected had it seen proper to enforce its political and exclusive rights. If the state of Indiana is to be regarded as an alien, it is laid down in Washburne on Real Property, 74, an alien may purchase and hold lands against all the world except the state; and Briggs, Hall & Sleeper may not say, with Louis XIV., "I am the state."

The title is conveyed from the state of Indiana to Martin R. Green. The deed is signed by the governor, on the authority of a resolution of the legislature of that state; and from Green the chain of title to the complainant is regular and unobjectionable. It is insisted that the deed to George E. Dodge is obnoxious to the act of the legislature of Georgia of 1877 forbidding foreign corporations to hold over 5,000 acres of land in the state. But the deed to Dodge was made before the passage of the act. Besides, this is a question for the state, and it is competent to take care of its own interests. Nobody but the state can raise the question. 3 Washb. Real Prop. 267.

A limited number of the respondents claim title from a different source than Colby, Chase, and Crocker. With regard to these the court can pass no decree. If there be controversy with these parties it can be settled in appropriate proceeding elsewhere.

As against Briggs, Hall & Sleeper; all the heirs of Colby, Chase, and Crocker; against Silas P. Butler, and those who hold under them,—the title of complainant as to these lands is valid, and must be protected, and the prayers of the bill are granted. Let the decree be framed accordingly. No damages have been proven.