## Stanley, Governor v. Townsend.

(Decided June 16, 1916.)

### Appeal from Franklin Circuit Court.

1. States—Fiscal Management and Public Debt—Issual of State Warrants—Submission to Vote of People.—The issuing of warrants by the Auditor of Public Accounts for appropriations made by the legislature in furtherance of public purposes, or for the ordinary expenses of the government, is not an act which ipso facto creates a debt within the meaning of sections 49 and 50 of the constitution; but for the legislature to provide for the payment of such warrants by the borrowing of money does create a debt within the meaning of such sections, and if such debt so created exceeds the sum of $500,000, it can not be authorized by an act of the legislature unless the same is submitted to a vote of the people as is provided by section 50 of the constitution.

2. States—Raising Revenue—Appropriations—State Warrants.—The only method provided by the constitution for the raising of public revenue is that pointed out by section 171 of the constitution, and if the appropriations of the legislature, together with the ordinary expenses of the state government, and for which the auditor may

issue warrants, exceed the amount of revenue provided by the legislature under said section, it is not competent for the legislature to authorize the issuing of certificates and to sell same and with the proceeds to take up and fund the warrants which the annual revenues will not meet, provided such deficiencies in the revenue, singly or in the aggregate, amount to more than $500,000, without first submitting the question to the people of the state and obtaining their consent that the said certificates or warrants might be issued and to otherwise comply with section 50 of the constitution.

3. States—Act Authorizing Creation of Debt Contrary to Sections 49 and 50 Constitution.—The act of the legislature at its 1916 session, being chapter 50, on page 500, of the published acts for 1916, examined and construed to authorize and empower the borrowing of money and the creating of a debt contrary to the provisions of section 49 and 50 of the constitution, and it is, therefore, held to be invalid.

M. M. LOGAN, Attorney General, and R. C. STOLL for appellant.

MILLER & MILLER for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The purpose of this action, filed by appellee as a citizen and taxpayer of the state in the court below against the Board of Sinking Fund Commissioners of the state of Kentucky and the officers composing it, is to test the constitutionality of an act passed by the legislature at its 1916 session, known as senate bill number 318, and being chapter 50 of the 1916 acts, and is found on page 500 of the official publication of the acts enacted during that session.

The trial court decided that the act was in violation of sections 49 and 50 of the constitution of this state; and granted the prayer of the petition by permanently enjoining the Board of Sinking Fund Commissioners from exercising any of the powers or doing any of the things provided for by the act in question, and to reverse that judgment the appellants prosecute this appeal.

The two sections of the act which it is claimed contain the vice complained of are sections 3 and 6, they being as follows:

"Section 3. The Board of Sinking Fund Commissioners of the state of Kentucky may borrow money in anticipation of the revenues of the Commonwealth for

any fiscal year in order to make payment of current obligations for which the Auditor of Public Accounts shall have issued warrants in conformity with law. The Sinking Fund Commissioners shall sign and issue certificates of indebtedness for money borrowed, as herein authorized, which said certificates shall be under the seal of the Commonwealth, attested by the Secretary of State. Such certificates shall in no event be made to exceed in the aggregate the amount estimated to be received from taxes and revenues of the Commonwealth within any current fiscal year, after deducting all advances and fixed charges. Such certificates of indebtedness shall not run for a longer period than one year, and shall not bear a greater rate of interest than five per centum per annum, and shall not be sold for less than par and accrued interest.

"The Board of Sinking Fund Commissioners is empowered to make contracts for the sale of such certificates of indebtedness as, in its judgment, may be considered for the best interests of the Commonwealth, with or without public advertisement as, in its discretion, may be deemed expedient.

"In the event of the failure at any time of the Board of Sinking Fund Commissioners to provide for cash payment of warrants for current purposes as authorized in the preceding paragraphs, whenever any warrant hereafter issued by the Auditor of Public Accounts shall be presented to the treasurer for redemption, and the funds appropriated for the purpose for which said warrant was issued are exhausted, the treasurer shall endorse thereon the date of its presentation with the words 'no funds with which to pay this warrant, and it bears five per cent. interest from this date until called in,' with his official signature thereto, and such warrant shall thereafter bear interest at the rate of five per cent. per annum, payable semi-annually; provided, however, that the Board of Sinking Fund Commissioners may subsequently make contracts for the sale of certificates of indebtedness, the amount of which shall include a sum sufficient to cover the outstanding warrants of the auditor issued for current purposes, as herein authorized, and thereupon the treasurer in the manner hereafter provided, shall call such warrants for redemption and the same shall be redeemed out of the proceeds of sale of certificates of indebtedness so issued and sold.

"For the payment of any and all certificates of indebtedness so issued and sold by the Board of Sinking Fund Commissioners, the taxes and revenues for the Commonwealth for any current fiscal year are hereby appropriated and definitely set aside, and said taxes and revenues shall, when received, be first applied to the payment of said certificates of indebtedness and interest thereon, and any surplus taxes and revenues after the payment of said certificates of indebtedness may be applied to the extinguishment of warrants or other indebtedness of the Commonwealth, as provided by law.

"Section 6. The Board of Sinking Fund Commissioners of the state of Kentucky may, at any time and from time to time, call in for payment all warrants which may now or which may hereafter be outstanding and upon which no date of maturity is now fixed, and the Board of Sinking Fund Commissioners may direct the auditor of the state of Kentucky to issue in lieu thereof warrants in such denomination of not less than one hundred dollars as the Board of Sinking Fund Commissioners may determine upon, which said warrants shall be due and payable to bearer or as the Board of Sinking Fund Commissioners may provide at a time to be fixed by the Board of Sinking Fund Commissioners, not exceeding, however, five years from the date of issue, and such warrants shall bear such a rate of interest, not exceeding five per cent., as the Sinking Fund Commissioners may determine upon, and the date of maturity of each of said warrants and the rate of interest shall be endorsed thereon by the treasurer. When any such warrants are issued as herein directed, the Board of Sinking Fund Commissioners shall advertise in two or more newspapers in the state of general circulation that such warrants are for sale, and shall ask for bids for the amount thereof, and any person desiring to submit a bid shall make out same, stating the rate of interest at which said warrants will be accepted and the par value in cash paid therefor, and file same with the said board on or before the date fixed in such advertisement, and upon the date fixed therefor by said board such bids shall be opened and the warrants sold to the bidder that offers to purchase them at the lowest rate of interest. When said warrants in which the maturity has been fixed as herein provided shall become

due and payable, if there be no money in the treasury to pay said warrants, other warrants may in like manner be issued in lieu thereof, with the date of maturity to be fixed by the Board of Sinking Fund Commissioners not exceeding five years from the date of issue of such warrants, and such warrants shall bear such rate of interest as the Board of Sinking Fund Commissioners may determine upon, not exceeding five per cent, and shall in like manner be endorsed by the treasurer and sold by said board, and in like manner new warrants may be issued from time to time, when and as warrants whose maturity has been fixed shall become due and payable, until there be money enough in the treasury to pay said outstanding warrants. The Board of Sinking Fund Commissioners shall have power to direct the treasurer to pay off any part of said warrants the maturity of which has been fixed, as in this section provided, whenever there is money enough in the treasury for the purpose of paying said warrants when such warrants shall mature.''

As stated, it is claimed that these sections provide for the creation of a debt by the legislature contrary to the provisions of the two sections of the constitution, *supra,* and, that we may fully understand the contentions made and be the more able to discuss the points raised, we insert herein the said sections, they being:

''Section 49. The General Assembly may contract debts to meet casual deficits or failure in the revenue; but such debts, direct or contingent, singly or in the aggregate, shall not at any time exceed five hundred thousand dollars, and the moneys arising from loans creating such debts shall be applied only to the purpose or purposes for which they were obtained, or to repay such debts; Provided, the General Assembly may contract debts to repel invasion, suppress insurrection, or, if hostilities are threatened, provide for the public defense.

''Section 50. No act of the General Assembly shall authorize any debt to be contracted on behalf of the Commonwealth except for the purposes mentioned in section forty-nine, unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and

shall have received a majority of all the votes cast for and against it: Provided, the General Assembly may contract debts by borrowing money to pay any part of the debt of the state, without submission to the people, and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon.''

It will be seen that a proper determination of the question presented involves not only the construction of the sections of the statute quoted, but likewise a construction of the sections of the constitution referred to in so far at least as to ascertain the sense in which the framers of the constitution used the words ''debts'' and ''debt'' when limiting the power of the General Assembly to borrow money or contract debts as therein referred to. By section 49 the General Assembly is authorized to contract debts which in the aggregate shall not exceed $500,000.00, and such debts shall be ''to meet casual deficits or failures in the revenue.'' This limitation on its power, however, does not apply if the debts are contracted to repel invasion or for other purposes therein mentioned in the proviso, but which have no application to the question before us. If it should become necessary to contract debts to an amount exceeding $500,000.00 for any of the purposes mentioned in section 49, other than in the proviso, the power to do so is given by section 50 of the constitution, but no debt in excess of $500,000.00 shall be contracted under the powers given by section 50 of that instrument, until the act providing for it shall have been ratified by a majority of the voters of the state at an election held for that purpose upon a general election day. A debt which the General Assembly may contract under the proviso to section 50 without a submission of the question to the voters of the state includes only the indebtedness of the state in existence at the time of the adoption of the constitution and has no reference to debts incurred subsequent to that time.

At this point we might receive aid by a reference to section 171 of the constitution. That section, so far as the necessities of the case are concerned, is: ''The General Assembly shall provide by law an annual tax, which, with other resources, shall be sufficient to defray the estimated expenses of the Commonwealth for each fiscal year. Taxes shall be levied and collected for

public purposes only." Aside from other minor sources, such as sharing in fines which may be assessed against those guilty of misdemeanors, and perhaps a few others, section 171 provides the only source from which the state may derive the necessary revenue to carry on the legitimate purposes of government, and it is "casual deficits or failures" in the revenues so provided that the General Assembly "may contract debts to meet" under the express provisions of section 49; and the same class of debts may be contracted under the provisions of section 50 of that instrument if the deficits amount to more than $500,000.00. It is insisted, however, that the borrowing of money and the consequent contraction of debts as provided by the act of the General Assembly under consideration are not included by those terms, as found in the sections referred to of the constitution, because, it is insisted, that under the doctrine laid down by this court in the case of Rhea, Treasurer v. Newman, 153 Ky. 604; James, Auditor v. State University, 131 Ky. 170; Hager, Auditor v. Gast, 119 Ky. 507; Eastern Kentucky Lunatic Asylum v. Bradley, 101 Ky. 551, and perhaps others, the provisions of the two sections of the constitution referred to do not embrace the ordinary expenses of the government, nor appropriations made for public purposes to a necessary arm or department of the government.

It may be conceded that under the facts of each of those cases this court held that such expenses and such appropriations were not included in the term "debts," as used in the constitution, but the question as to the power of the legislature to issue or authorize to be issued the obligations of the state for the purpose of borrowing funds with which to discharge the ordinary expenses of the government, or to pay the character of appropriations mentioned, was not presented to this court for its determination in any of the cases referred to. On the contrary, a reading of those cases is sufficient to convince us that the court would have held to an entirely different view if there had been presented to it in those cases the question of the right of the General Assembly to borrow money with which to liquidate and pay warrants which may have been issued as representing the ordinary expenses of the government, or appropriations made by the General Assembly. It was

considering only the right to issue warrants, but not the right to borrow money to pay them.

In the Rhea case, *supra*, the question before the court was the legality of an act approved March 19, 1912, appropriating the sum of $30,000.00 for the purpose of paying the indebtedness of the Kentucky State Fair. Previous to the passage of the act making the appropriation, the legislature at its 1910 session had passed an act whereby warrants which should be issued by the Auditor of Public Accounts might draw interest until there was sufficient money in the treasury of the state to take them up, which interest should commence from and after they should be endorsed by the treasurer of the state as provided in the act. The auditor issued a warrant to the Kentucky State Fair, which was duly presented to the treasurer for his endorsement so that the warrant might draw interest, but this officer declined to make such endorsement, and that suit was brought to compel him to do so. Two questions were presented for determination, which were: The right of the legislature to permit warrants issued by the auditor to draw interest, and whether or not the *appropriation* was the contracting of a debt within the meaning of that term as used in the constitution. This court determined in that case that the authorizing the auditor's warrants to draw interest until there was sufficient funds in the treasury to pay them was valid and that the appropriation of the money to the Kentucky State Fair was not *ipso facto* the contracting of a debt within the meaning of the two sections of the constitution referred to.

A careful reading of that opinion will show that the discussion of the question was directed solely to the matter presented, which, as stated, was whether or not the mere appropriation of money was the contracting of a debt, which was answered in the negative by adopting the following excerpt from the James case, *supra*:

"It is, we think, further manifest that appropriations such as these cannot fairly be said to create an indebtedness against the Commonwealth, for they may be discontinued, reduced, or changed at the pleasure of the legislature, or that body might, at its next session repeal the act as to so much of the appropriations as would then remain unpaid; but these things could not be done if the appropriations *were a debt.*"

And from the Hager case, *supra,* this excerpt:

"Nor does this appropriation create an indebtedness against the Commonwealth. It may be discontinued, reduced or changed at the pleasure of the legislature, which could not be done if it were a debt. It is a gratuity, just as the present provision for the support of the insane and idiots is, which may be altered both as to the amount and manner of application, at the pleasure of the law-making body."

And the court, out of abundant caution that its position might not be misunderstood, finally uses this significant language:

"The distinction here pointed out by the court as to the legal nature and effect of an appropriation is necessarily sound, for, when we speak of one being indebted, we contemplate the state of his being under obligation to make payment, as of money or services, to another.

"We do not mean to be understood as saying that an appropriation may not constitute a debt. It may be of such a character as to have all the essential elements of a contract, and in such a case unquestionably it would be a debt; but under the authorities quoted above, an appropriation which merely authorizes the payment of a gratuity, or is made in support of one of the state institutions, or to create or maintain a useful arm of the state government, or to defray the ordinary or current expenses of the state, does not constitute a debt such as is prohibited by section 49 of the constitution."

Further along in the opinion it is said:

"That the validity of an appropriation of money by the legislature beyond the limit of $500,000.00 prescribed by the constitution must depend in each case upon the character of the appropriation, *or the manner of its payment.*"

And continues by stating, that if the part of an appropriation to be annually paid does not exceed $500,-000.00, the limit provided in section 49 of the constitution, it is competent for the legislature to make it, but the court is careful to say:

"If the legislature should borrow, or appropriate, $100,000.00 for some purpose other than the ordinary expenses of the government, and the amount thus borrowed, or appropriated, would carry the indebtedness

of the state beyond the constitutional limit, the act would be unauthorized.''

In the closing part of the opinion the court recognizes the necessity that the money with which such appropriations may eventually be paid shall be derived through the means provided by section 171 of the constitution, *supra*, and not by a borrowing of money, when it says:

''But the fact that the money was not in the treasury when the warrants were presented did not affect their validity, since they will be paid by the treasurer when the money comes in, in the due course of the revenues.''

In the James case, *supra*, the question presented was whether certain appropriations made to the State University, at Lexington, and to the Eastern Kentucky State Normal School at Richmond, contravened the provisions of section 49 of the constitution by the creation of a debt contrary to its provisions, and this court determined that it did not, for the reason stated in the Hager case in the language herein before given, but this court therein uses significant language to this effect:

''We may, however, concede, and do concede, that under sections 49 and 50 of the constitution, the legislature has not the power to make appropriations in excess of the revenues provided by law and the cash in the treasury, whereby a deficit of more than $500,000.00 may be created. In these cases it does not appear that such a state of affairs exists because of the appropriations in dispute, as only one-third of the lump appropriations is payable in the current year. Whether, therefore, an appropriation is a debt in the meaning of sections 49 and 50 of the constitution, must depend upon the character of the appropriation, *and the manner of its payment.*''

The court then shows that from the facts before it the parts of the appropriation to be made annually, could be met each year out of the revenues to be derived from taxation for that year, and for this reason concluded, that they were not debts prohibited by either section 49 or 50 of the constitution. There is nothing in any of the other cases from this court in conflict with the holdings in the two cases which we have considered.

The single idea which was in the mind of the court in rendering these opinions was that neither an appro-

priation as such, nor ordinary expenses of the government as such, constitute the contracting of a debt by the legislature, and it is further the dominant idea pervading the cases, that the appropriations then under consideration could be paid out of the revenues for the fiscal year to be derived through the exercise of the legislative power given under section 171 of the constitution. It is nowhere indicated in any of the opinions that it would be lawful for the legislature to make appropriations and to subsequently borrow the money with which to pay them in any other way than that prescribed by sections 49 and 50 of the constitution; nor do we interpret the opinions to mean that the ordinary expenses incurred in running the state government may be paid in any other way than from money collected under the general revenue law or obtained by borrowing it as provided in those sections. On the contrary, it is plainly shown by the opinions of this court in the cases *supra,* that the matters under consideration were found not to be debts because, and only because, the appropriations being therein considered might be discontinued, reduced or changed, at the pleasure of the legislature, or the act making them might be repealed, saying, however, "but these things could not be done if the appropriations were a debt." The distinction was further pointed out that an appropriation or the issuing of a warrant therefor was not a debt because it did not amount to an obligation to pay as does a debt. This is shown by the following language: "When we speak of one being indebted we contemplate the state of his being under obligation to make payment." And further: "It (appropriation) may be of such a character as to have all the essential elements of contract, and in such a case unquestionably it would be a debt." The idea is also expressed in those cases that the warrants issued by the auditor whether for appropriations or for ordinary expenses of the state government are to be paid eventually by money collected as revenue of the state and not from that which may be borrowed, as will be seen from the last quotation which we have taken from the Rhea case, *supra.*

There is a vast difference between issuing warrants for any of these matters which are to be paid as presented, or in the order of their identification, out of the annual revenues of the state, although they may exceed

such revenues; and the contracting of a debt by borrowing money to pay such warrants which might have been issued in excess of the collected revenue, thereby producing ''casual deficits or failure in the revenues.'' The holder of such warrant issued in excess of the collected revenue might be enabled to receive payment out of the proceeds of the collections for some subsequent year, but the legislature cannot borrow money for the purpose of paying him except in the manner provided by the constitution; and the fact that the revenues for any year may be anticipated and even appropriated in anticipation of its collection, as is stated in the Rhea case, cannot alter the rule. There are but two ways by which the legislature, under the constitution, is authorized to raise money. One is, by providing a revenue law under the powers given by section 171 of the constitution, and the other is, by borrowing money under the provisions of sections 49 and 50 of that instrument; and it is not permissible for it to authorize the funding of outstanding warrants which are issued in excess of the revenues provided for any fiscal year in any other way than that pointed out by the sections of the constitution above referred to. The question, then, is, whether the act of the legislature under consideration has for its purpose the creation of a debt by borrowing money in violation of those two sections (49 and 50) of the fundamental law.

A rule of great assistance in the construction and interpretation of a statute is, to ascertain the purpose of the legislature in enacting it, and to ascertain its effect by looking to its substance rather than to its title, or to the forms of expression used in it. This rule is well stated and fortified by many authorities in volume 6 R. C. L., on pages 81-82, thus:

''The constitutionality of an act depends rather on its real character and on the end designed to be accomplished, than on its title or the professions as to its purpose which may be contained in it, and therefore such declarations do not conclude the courts. The general rule, therefore, is, in whatever language a statute may be framed, its purpose and its constitutional validity must be determined by its natural and reasonable effect.

''It has been said that the eyes of courts are never limited to the mere letter of a law, but that they may

look behind the letter to determine its true purpose and effect. Accordingly the principle has been laid down that the courts are not bound by mere forms, nor are they to be misled by mere pretenses, but they may look at the substance of things, whenever they enter on the inquiry whether the legislature has transcended the limits of its authority. * * * The question as to the constitutionality of an act is to be determined, not by what has been done under it in any particular instance, but by what may be done under and by virtue of its authority. In some cases, however, the courts may properly have recourse to an assumed extreme state of facts in order to test the validity of a statute.''

Guided by this rule, we find that section 3 of the act whose validity is assailed in this suit, empowers the Board of Sinking Fund Commissioners to borrow money in anticipation of the revenues for any fiscal year with which to pay warrants which may have been previously issued by the auditor; but in the first part thereof it is provided that the certificates which the commissioners may issue, and which are nothing less than the obligations of the state to pay the amount of money therein specified, shall not exceed in the aggregate the amount of estimated revenues for that year to be derived from existing laws. These certificates shall not run for a longer period than one year. Should any of the warrants issued by the auditor not be paid in cash from the proceeds of certificates issued and sold by the sinking fund commissioners on presentation to the treasurer, that official shall endorse on them the fact of their presentation and that there are no funds with which to pay them, and they should, after that time, bear interest until paid; and under the proviso to that section, the Sinking Fund Commissioners may issue additional certificates and borrow sufficient money to liquidate the warrants issued by the auditor in excess of the revenues collected or anticipated for the year in which they were issued.

By section 6 of the act, it is provided that the auditor, upon direction from the Sinking Fund Commissioners, may issue warrants in denominations of not less than $100.00, and to be paid at a fixed date not exceeding five years from the date of issue and bearing interest from date, which warrants so issued by the auditor under the direction of the Sinking Fund Com-

missioners may be sold in the manner provided in the act, and the proceeds used in paying off all the warrants which have theretofore been issued by the auditor, as well as those which might thereafter be issued by him in excess of the amount to be paid by the proceeds of the sales of certificates issued by the Sinking Fund Commissioners (under section 3), in anticipation of the revenues provided for each year. It is further provided that when such warrants issued by the auditor under the direction of the Sinking Fund Commissioners, as above referred to, shall mature, they may be renewed if there is no money in the treasury to pay them, the renewal warrants to be of the same character as those renewed. This process, under the provisions of the act, may continue indefinitely "until there be money enough in the treasury to pay said outstanding warrants." It is provided that the interest on the certificates to be issued by the Sinking Fund Commissioners under section 3 shall be payable semi-annually, and the same provision is made in section 6 as to the warrants which the auditor may issue under the direction of the board.

Applying the rule of interpretation above referred to, we find that the object, contemplation and purpose of this act is to authorize the Sinking Fund Commissioners to borrow money for which they issue what the act calls *certificates* and empowers that board to direct the auditor to issue what the act terms *warrants,* which have all of the ear marks and features of an ordinary bond. They are each made payable at a definite date in the future and bearing interest payable semi-annually, and under the terms of the act they are made negotiable and free from taxation. Thus, by the terms of the act, provision is made whereby the obligations of the state may be issued and the entire deficits in the revenue not only in past years but in future years may be funded.

It surely requires no argument to show that the exercise of such powers through the agencies provided in the act is nothing short of borrowing money, resulting in the creation of a debt, which, according to facts alleged in the petition and admitted in the answer, is far in excess of the limitations found in section 49 of the constitution, and which debt, under the wording of the act, may be increased from year to year indefinitely.

The authority of the legislature to provide for borrowing of money and the funding of past and future issued warrants upon the treasury in excess of the revenue provided for that year is directly in contravention of its power to create debts as prescribed by the constitution. It may have been, and we presume was, not the intention of the legislature in enacting the law, to thus transcend its authority. Nevertheless, the application of the act and the result and consequences have that effect. It was deemed wise by the makers of the constitution that when the creation of a debt beyond $500,000.00 was contemplated, the people of the state who have the taxes to pay should have a voice in the matter. They are entitled to this, but whether so or not, the constitution guarantees it to them, and we find no authority to withhold it from them after becoming convinced that through an oversight of the legislature, or for other reasons, the voters of the state have been denied it. Ample provision is made by the constitution through which sufficient revenues to defray all of the legitimate purposes of the government may be raised, but if this power is not exercised, and it should be thought by the legislature to be more wise to borrow a portion of the funds necessary to run the state, then this must be done within the limitation imposed by the constitution.

Briefly summarizing, we hold, that the ordinary expenses of the state government, as evidenced by the warrants of the auditor issued to the persons rendering the service, are not, up to that time, debts, the contracting of which is forbidden by section 49 of the constitution; nor does the issuing of a warrant by the auditor for a part or all of an appropriation made by the legislature, necessarily create a debt contracted in violation of that section, as the payments of these together with interest, may be deferred until such a time as the revenues of the state, produced from the revenue laws, may be sufficient to pay them; that the legislature is not authorized to create a debt by authorizing the issuing of *certificates* or *warrants* having all of the characteristics and features of bonds and which may be negotiated and the proceeds used for the purpose of paying warrants issued by the auditor for any of the purposes stated, and representing deficits or failures in the revenue, without pursuing the course pointed out by the sections of the constitution, *supra;* that the provisions of the

act in question permit the creation of a debt contrary to such provisions and is, therefore, beyond the power of the legislature to enact.

The trial court having so held, its judgment is affirmed.

Whole court sitting.