## Christman v. Wilson, et al.

### (Decided April 23, 1920.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. States—State Fair—Other Agencies of the State—Power They May
   Exercise.—The State Fair and other like agencies of the state, cre-
   ated by the legislature as a matter of convenience to enable the
   state to perform functions that it must confide to some body, are
   agencies of limited authority, and when it becomes necessary to
   ascertain their powers, duties and liabilities, the legislatve acts
   creating them must be looked to.
2. States—State Fair—Other State Agencies—Power to Create Debts
   and Mortgage Property.—Nothing less than an express grant of
   power by the legislature will enable the State Fair or other like
   agency to create any indebtedness or mortgage the property under
   its control.  Such power will not be conferred by implication.
3. States—Indebtedness Against—How May Be Created—Legislature
   Only Authority.—The legislature of the state is the only authority
   competent to create an indebtedness against the state, but it may
   grant to agencies created by it the power to do so within the lim-
   tations of the Constitution.
4. States—Appropriation by Legislature—Interest-Bearing Warrants.
   —The state may make appropriations and if it has not the money
   in the treasury to pay them, may issue interest-bearing warrants
   until the money has been placed in the treasury.
5. States—Bonded Indebtedness Against—Power of Legislature to
   Create.—The legislature cannot, except in the manner provided in
   the Constitution, create any bonded indebtedness against the state,

nor can it authorize any state agency to create such an indebt-edness.

HARDIN H. HERR for plaintiff.

MOORMAN & WOODWARD for defendants

CHARLES I. DAWSON, Attorney General, and T. B. McGREGOR, Assistant Attorney General, attorneys for state.

OPINION BY CHIEF JUSTICE CARROLL—Sustaining in part motion to grant injunction.

In 1906, the Kentucky State Fair was established by the General Assembly and its management and control placed in the hands of the State Board of Agriculture, Forestry and Immigration.

In the act creating the state fair, which may be found in section 4618-b, Kentucky Statutes, annual appropriations were made for its use and benefit and it was further provided that the board "shall have the power to accept donations of lands or other thing of value, and may hold same by deed or contract for the use and benefit of said fair, and may purchase grounds and erect proper buildings and other improvements on same and on donated grounds and pay for same out of any funds it may have on hand from donations or profits from holding fairs, but shall not expend any part of the annual appropriation therefor."

In other parts it was provided that: "Said board is authorized to accept donations of lands or other things of value, as above provided, conditioned upon the permanent location and continuation of said fair at the place making such donations and upon the continuation of the present state appropriation for said fair, and that said lands or other donations shall be returned to the city, county or individuals making same, upon the discontinuance of said fair or said appropriations: Provided, should any such donated grounds have been enhanced in value by the erection of improvements thereon by said board out of the funds of said fair, by the state, then the said board, or the state, shall be reimbursed and shall have a claim and lien upon said lands to the extent of the value of such improvements at the time of the discontinuance of said fair or said appropriations."

And also that: "Any profits derived from the fair shall go into a sinking fund to be used for succeeding

fairs or for the purchasing and providing of permanent grounds or buildings when permanently located by the state.''

Under the authority of this act, a body of land sufficient for the purpose was secured by the board of managers, either by donation or purchase, perhaps in both ways—the record does not show—and annually since 1906 a state fair has been held on the grounds so procured.

In 1920, the legislature, under a title reading ''An act for the benefit of the Kentucky State Fair and authorizing the State Board of Agriculture to bond the property owned by it for the purpose of securing funds with which to place a permanent agricultural, merchants' and manufacturers' building upon said Kentucky State Fair grounds,'' set out that: ''Whereas, there has been conveyed to the State Board of Agriculture certain real estate in Jefferson county, Kentucky, for the use, benefit and purposes of the Kentucky State Fair; and, whereas, permanent buildings and improvements have been erected on said land for the use and benefit of the Kentucky State Fair and said fair conducted thereon; and, whereas, an agricultural, merchants' and manufacturers' exhibit building is urgently needed for the use and benefit of said Kentucky State Fair; and, whereas, the Commonwealth of Kentucky has not now sufficient money in the treasury, not otherwise appropriated, to add such needed permanent building.''

Following this preamble it was enacted: ''That the State Board of Agriculture be, and it is hereby, authorized and empowered to bond the Kentucky State Fair property for a sum not to exceed three hundred thousand dollars ($300,000.00) in order to meet and pay the cost of an agricultural, merchants' and manufacturers' exhibit building, and that the said State Board of Agriculture is hereby authorized and empowered to borrow said money upon such time or terms as it may deem best for the interests of the said Kentucky State Fair, but the rate of interest paid upon any such loans shall not exceed six per cent per annum. That the State Board of Agriculture be authorized and empowered to create a sinking fund from such part of the moneys collected from the rental of space in said building as it deemed expedient, for the purpose of retiring as much of said bonded indebtedness as possible.''

It will be noticed that this act refers to the State Board of Agriculture as the agency of the state having control of the state fair in place of the State Board of Agriculture, Forestry and Immigration, designated as the managing body in the act of 1906 that established the state fair, and this change was made because in 1912, the legislature created a State Board of Agriculture, with the provision that it should succeed to all the powers, rights, privileges and property of the State Board of Agriculture, Forestry and Immigration, which board was abolished.

This act of 1912, further provided that "The board of agriculture, when so appointed and qualified, shall be a body corporate, under the corporation name of the State Board of Agriculture, and as a corporation shall have the power to sue and be sued, to plead and be impleaded, to contract and be contracted with, and possess all the immunities, rights, privileges and franchises usually attached to corporate bodies."

So that now and since 1912, the title to all the property donated to or purchased for the benefit of the state fair is—subject to the provisions of the act of 1906—in the State Board of Agriculture, and under its management and control the state fair has been conducted since 1912.

The act of 1920, contained an emergency clause, and soon after it went into effect, the State Board of Agriculture adopted a resolution setting out that it had been "duly authorized and empowered by the state of Kentucky to borrow money for and on behalf of the state of Kentucky, to the extent of $300,000.00, and issue bonds therefor, and to pledge by mortgage or deed of trust Kentucky State Fair property to secure the payment thereof;" therefore, it was resolved that the board "do borrow the sum of three hundred thousand dollars ($300,000.00) at the rate of interest of six per cent per annum, payable semi-annually, and as evidence thereof do issue negotiable coupon bonds of the State Board of Agriculture, and do amply secure the same by trust agreement upon all the property, except real estate, both that which it now owns and which it may hereafter acquire, of the Kentucky State Fair."

For the purpose of providing a fund for the payment of the principal and interest upon the bonds proposed to be issued, the board, in the resolution, set apart and

appropriated the rents and profits that might be derived from the building to be erected with the money realized from the bond issue.

The resolution further set forth that the bonds should be of the denomination of one thousand dollars ($1,000.00), bearing interest at the rate of 6 per cent per annum, payable semi-annually, and specified sums thereof should mature in November of each year from 1921 to 1945, inclusive.

It was further provided that a deed of trust or mortgage should be executed to a trustee upon all of the property owned by the state fair for the purpose of securing the payment of the principal and interest on the bonds.

The board also adopted a form of bond, setting out, among other things, "that the board of agriculture, state of Kentucky, acknowledges itself to owe, and for value received hereby promises to pay to bearer one thousand dollars ($1,000.00) on the first day of November, ——, with interest thereon from the date hereof until paid."

Following this action by the board, the plaintiff, Henry Christman, a citizen and taxpayer of Kentucky, brought this suit against the members of the State Board of Agriculture, and one James C. Wilson, doing business as James C. Wilson & Company, and in his petition, after setting out in substance the legislative act of 1920, and the proceedings of the State Board of Agriculture thereunder, averred that the board of agriculture was about to issue, sell and deliver bonds to the amount of $300,000.00 to Wilson & Company, and place a mortgage on the property of the Kentucky State Fair to secure the payment of the bonds and interest, and unless enjoined by the court the board would make the bonds and interest it proposed to issue "an obligation of the state of Kentucky and a charge against the entire property of the Kentucky State Fair;" that by the issual of these bonds the board would "pledge the faith and credit of the state of Kentucky to the extent and in the event of default in the payment of the principal and interest on said bonds at maturity from the revenues derived from the rental of space in the said agricultural, merchants' and manufacturers' exhibit building."

It was further averred that the board of agriculture was "without power and authority to pledge the faith and credit of the state of Kentucky to secure the pay-

ment of the said bonds with interest thereon and to the extent that the aforesaid act authorizes said board so to do it is null and void."

It was also averred that no provision was made by the board in the resolution adopted by it for the payment of the interest on the bonds; that the fund provided will not be sufficient to pay them at maturity, and that the board will, unless restrained, "sell said bonds to the said James C. Wilson and Company, and thereby obligate and pledge the faith and credit of the state of Kentucky for the payment of said bonds at maturity."

It was further charged that the issual of said bonds as an obligation of the state would be the creation of a debt against the state and a violation of the Constitution, and it was, therefore, prayed that the board of agriculture be restrained from issuing, selling or delivering the bonds it proposed to issue.

To this petition the board of agriculture and Wilson & Company filed a general demurrer, and when the case came on to be heard on the motion for an injunction, the Honorable Samuel B. Kirby, judge of the Jefferson circuit court, overruled the motion for an injunction and sustained the demurrer to the petition. Following this, the plaintiff, Christman, has applied to me under the authority of section 296, of the Code, to grant the injunction refused by judge Kirby.

It will be observed that it is alleged more than once in the petition that it is the purpose of the board of agriculture, under the assumed authority of the act of 1920, to pledge the faith and credit of the state for the payment of the bonds proposed to be issued, and the interest thereon, in addition to the property and income of the state fair that the act authorized it to give as security for the bonds and interest.

It also appears that counsel for the board, as well as Wilson & Company, assert in their brief that the board has the power to do this and that this is what it intends to do, although I must here stop to say that I am at a loss to understand where counsel for Christman or the board found in the act of 1920, or any other act, authority for this assumption of power on the part of the board. That the board did not think it possessed this power is apparent in the resolutions adopted by it, which do not so much as intimate that the bonds proposed to be issued will be an obligation of the state.

I do not, however, question that counsel for the board represent its views and therefore must and do assume that the real purpose of this friendly suit is to have it finally determined whether the board has this power, and if it should be held that it has, I have no doubt that the board will adopt other resolutions and take other appropriate action to make these bonds and interest obligations of the state.

Treating the case then as I find it made up by counsel, there are two questions to be considered. First, the right of the board to mortgage or pledge the property owned by the state fair, and the income and profits thereof, for the payment of these bonds and interest; and, second, the right of the board to make these bonds an obligation of the state and bind it for their payment with interest thereon.

Prior to the act of 1920, I am very sure that the board of agriculture had no authority to create an indebtedness and pledge to secure its payment the property of the state fair, or any part thereof, or any income or profits that might be realized from the conduct of the fair.

This board, as I have said, is merely an agency or arm of the state government, invested only with such authority as may be conferred on it from time to time by the legislature of the state. It was created by the legislature as a matter of convenience, to enable the state to perform functions that it must in the necessity of things confide to some instrumentality created by the law making department; and when it becomes important to ascertain the powers of this board, the duties it may exercise and the liabilities it may assume, the legislative acts creating and relating to it must be looked to and from them its powers, duties, responsibilities and liabilities are to be determined.

Taking then the legislative acts as a guide by which to measure the authority of the board, I do not find conferred by any of them, prior to the act of 1920, the power to create any indebtedness or to mortgage or pledge the property of the state fair, or the income or profits derived therefrom, to secure in whole or in part the payment of any indebtedness.

In the act of 1906, creating the state fair, the board was given the right to purchase ground and erect buildings and improvements thereon and "pay for same out of any funds it may have on hand from donations or

profits from holding fairs, but shall not expend any part of the annual appropriation therefor." And it was further provided that any profits derived from the fair should go into a sinking fund to be used for succeeding fairs or the purchasing and providing of permanent grounds or buildings.

In other acts, appropriations were made to be used for paying premiums, to pay indebtedness existing at the time the appropriation was made and to erect buildings. The State Board of Agriculture was also created a body corporate, with the power to sue and be sued, contract and be contracted with, and possessed such rights and privileges as usually belong to corporate bodies; but in creating it a corporation, it was only intended that it should exercise in its corporate capacity such powers conferred on it by the legislature either expressly or by necessary implication as were necessary to enable it to manage the property of and conduct the state fair, in which management and conduct it was essential that there should be some well identified agency to whom persons having business or other relations with the state fair might look and with whom they might enter into contracts.

It is, therefore, I think, manifest that prior to 1920, the legislature did not invest this board of agriculture with the power to create an indebtedness such as might be created by an ordinary corporation, or any indebtedness, or give it authority to pledge the property or income of the state fair for any purpose. Nothing less than an express grant of power by the legislature would enable it to do this, and no such grant can be found except in the 1920 act. Nor is such grant of power to be implied, because it would be a dangerous business policy to confer by implication on this or any other of the many agencies, created for the purpose of transacting the business of the state, the power to create an indebtedness, or any indebtedness, against the property under their control, or to mortgage or pledge such property for the payment of any debts they might think it proper to create.

In this connection, it is pertinent to notice that not so long ago, the managers of one of the state institutions assumed, without express authority to do so, the right to create an indebtedness against the property under its control, and the legislature in order to stop this improvident practice thought it necessary as well as advisable to

put in an act of 1912, now section 4535-b, of the Kentucky Statutes, a prohibition against it, coupled with a heavy penalty for its violation.

It is, therefore, I think, clear that the purpose of the legislature, in adopting the act of 1920, was to confer upon the State Board of Agriculture the authority not theretofore possessed by it to create an indebtedness and pledge in the manner and to the extent allowed by the act the property and income of the state fair for its payment.

That this act was not intended to do more than this is shown by the title, which recites that it is for the benefit of the Kentucky State Fair, and confers authority on the State Board of Agriculture to "bond the property owned by it for the purpose of securing funds with which to place a permanent agricultural, merchants' and manufacturers' building upon said Kentucky State Fair ground," as well as by the body of the act, which, keeping well within the purpose of the title, authorizes the board of agriculture "to bond the Kentucky State Fair property for a sum not to exceed $300,000.00 in order to meet and pay the cost of the agricultural, merchants' and manufacturers' exhibit building;" and to "create a sinking fund from such part of the moneys collected from the rent of space of said building as it deemed expedient for the purpose of retiring as much of said bonded indebtedness as is possible."

But in the face of the purpose plainly expressed in this act, it is, as I have said, seriously contended that the board of agriculture has the power under it to obligate the state for the payment of the indebtedness the board was authorized by the act to create.

In support of this contention, counsel for the board of agriculture rely on the cases of Williamson v. Louisville Industrial School of Reform, 95 Ky. 251; and Zoeller v. State Board of Agriculture, 163 Ky. 446, which hold that the various agencies of the state government, such as the board of agriculture, and the board having control of the penal and charitable institutions of the state, are mere arms of the state government, and, although incorporated, are no more liable to suit for torts than the state would be for the wrongful act of any of its agents or officers. But this line of cases furnish no authority whatever in support of the argument presented by counsel that the State Board of Agriculture has the power, under

the act of 1920, to bind the state for indebtedness created by it. In this act the legislature, which is the only authority competent to create an indebtedness against the state, expressed its willingness to grant the board authority to create in the manner provided the indebtedness mentioned, and to bond the property under its control to secure the money, which, together with the interest thereon, should be paid out of the rentals of the building directed to be constructed.

This was as far as the legislature would go, and it is a long way from saying that the board might bind the state to pay this indebtedness, or any part thereof.

Nor is the case of Hager, Auditor, v. Gast, 119 Ky. 502, pertinent, because in that case it was expressly provided in the legislative act that the state should bear its proportionate cost of making street improvements adjacent to property owned by it.

The Kentucky Livestock Breeders' Assn. v. Hager, 120 Ky. 125, is also relied on, but in that case the only question was the constitutionality of an act passed in 1902, appropriating money for the benefit of the Kentucky Livestock Breeders' Association, which was authorized to conduct a state fair; and the court held that a state fair was a public purpose within the meaning of the Constitution, and therefore public funds might be employed for its use and benefit.

In Rhea, Treasurer v. Newman, 153 Ky. 604, it was likewise held that an appropriation by the legislature in aid of the state fair was for a public purpose, and that the legislature, without violating the Constitution, might authorize the issual of interest bearing warrants to take the place of the money appropriated which was not available at the time.

There is, however, in this case no question involving the power of the legislature to issue interest bearing state warrants for the purpose of meeting present state obligations that the state has not sufficient money in its treasury to pay, or its power to authorize the State Board of Agriculture to erect buildings on the state fair grounds and appropriate money out of the state treasury for the purpose, or its power to authorize the issual of interest bearing state warrants until it has the money in its treasury to meet the appropriation and redeem the warrants; but the legislature did not attempt to do this, or to exert in this respect the power it possesses.

It could not, however, if it had so desired, have authorized the State Board of Agriculture to create a bonded indebtedness against the state in any amount or for any purpose, such as it authorized the State Board of Agriculture to incur on the faith and credit of the property under its control.

I say this, because the legislature in 1916 attempted, in flagrant violation of the Constitution, to create a large and unlimited bonded debt by converting all interest bearing state warrants then outstanding, or that might thereafter be issued, into interest bearing bonds; but this court, in the case of Stanley v. Townsend, 170 Ky. 833, in declaring this legislation invalid, said that the legislature had no authority to create an indebtedness against the state in the manner proposed.

In view of this decision it is plain that if the legislature should authorize the State Board of Agriculture, or any other agency of the state government, such as the State Normal Schools, the State University or the penal and charitable institutions of the state, to create debts and issue bonds that would be an obligation of the state, it would be an attempt to do in another form exactly what we said in the Stanley case the legislature could not do. Obviously, if the legislature cannot, by direct enactment, create a bonded indebtedness against the state except in the manner provided in the Constitution, it cannot delegate this power to any agency of the state.

Upon the whole case, I find no warrant whatever for the exercise of the power attempted by the State Board of Agriculture in its proposal to issue bonds that will be and become a direct obligation of the state; and, therefore, the board of agriculture should be perpetually enjoined from issuing any bonds that will be an obligation of the state, and to this extent the motion to grant the injunction refused by Judge Kirby is sustained.

So much of the motion, however, as attempts to restrain the board of agriculture from creating an indebtedness and issuing bonds therefor in the manner and within the limitation of the act of 1920 is overruled.

In considering this case, I had the assistance of Judges Thomas, Clarke and Quin, who concur in what I have said and in the conclusion reached.