## Klein, et al. v. City of Louisville, et al.

(Decided May 22, 1928.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Statutes.—Act February 16, 1928, authorizing cities of the first class to construct and operate bridges across navigable stream forming a state boundary, held not in conflict with Constitution, sec. 51, as containing provisions not sufficiently indicated by its title or as dealing with more than one subject.

2. Statutes.—Act February 16, 1928, authorizing cities of the first class to construct and operate bridges across any navigable stream forming a state boundary, held not within Constitution, sec. 59, forbidding passage of local or special laws, since operation and control of bridge by city is incidental to government of municipality, and comes within section 156 dividing cities and. towns of commonwealth for purpose of organization and government into classes.

3. Municipal Corporations.—Bonds authorized under Act February 16, 1928, for construction and operation of bridges by cities of the first class across any navigable stream forming a state boundary to be paid from a special fund derived from tolls and revenues of the bridge without any obligation of the city thereunder, held not to constitute a debt within meaning of Constitution, secs. 157, 158, limiting indebtedness of. city.

4. Constitutional Law.—Act February 16, 1928, authorizing bridges across navigable stream forming a state boundary, and delegating power to commission to fix toll to be charged, held not in violation of Constitution, sec. 181, since such provision relates only to taxes on property, and tolls do not constitute taxes, but are charges on privileges of using bridge, and are analogous to special assessments.

5. Constitutional Law.—Act February 16, 1928, authorizing cities of the first class to construct and operate bridges across navigable stream forming state boundary, held not in violation of Constitution, sec. 160, because authorizing commission to fix tolls to be charged so as to thereby confer legislative power, since commission may be said to function as an administrative body to carry out legislative intent, and is necessarily vested with some discretion.

6. Bridges.—Act February 16, 1928, authorizing cities of the first class to construct and operate bridges across navigable streams forming state boundaries, held not invalid because conferring extraterritorial powers pursuant to action of federal Congress, based on Federal Constitution, art. 1, sec. 8, authorizing exercise of right of eminent domain in adjoining states.

7. Municipal Corporations.—Bonds issued by city pursuant to Act February 16, 1928, authorizing construction and operation of

bridges across navigable stream forming state boundary, being issued by a commission functioning only as agent of the city, and payable only from a special fund to be derived from tolls, held not within Constitution, sec. 193, forbidding sale of bonds below par.

8.   Taxation.—Act February 16, 1928, authorizing construction and operation of bridges across navigable stream forming state boundary, held not invalid because exempting bonds authorized therein from state and municipal taxes, since construction and maintenance of bridge is for public purposes, and Legislature was authorized to exempt bonds from taxation in accordance with Constitution, secs. 170, 171.

9.   Constitutional Law.—Provision of Act February 16, 1928, authorizing cities of the first class to construct and operate bridges across navigable stream forming a state boundary, to effect that commission created therein might enter into agreement with trust company as trustee for holder of bonds issued with provision for protecting and enforcing rights and remedies of trustee and bondholders for approval of contract for construction by consulting engineers approved by bond purchasers, held not an unlawful delegation of power to trustee and purchasers of bonds.

WILLIAM F. CLARK and GORDON & LAURENT for appellants.

WILLIAM T. BASKETT, CHESTER B. MASSLICK and E. J. MARSHALL for appellees.

O'NEAL & O'NEAL amici curiae.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

By an act of the General Assembly of this state approved February 16, 1928, cities of the first class are authorized to construct and operate bridges across any navigable stream forming a state boundary; the venture to be financed by the sale of city revenue bonds which are to be paid solely from the tolls and revenues of the bridge, and for which the city is not to become liable or to incur any obligation; actual construction and operation to be under the control and supervision of a commission, to be appointed by the mayor and approved by the legislative bodies of the city, and forming a body corporate. By a similar act of the federal Congress approved February 25, 1928 (chapter 101), the city of Louisville was authorized to construct and maintain a bridge across the Ohio river at that point, in accordance with the legislative act; and it and its commissioners were empowered to exercise the right of eminent domain in the adjoining state of Indiana.    The commission was

duly appointed and confirmed. It contracted for the sale of $6,000,000 in bonds, and was proceeding in conformity with the two acts to issue the bonds and contract for sites and the construction of the bridge when this action was filed by certain taxpayers of the city of Louisville attacking the validity of the legislative act, as well as certain provisions of the federal act and the legality of a trust indenture executed by the commission under the authority of the act, and finally seeking to enjoin the commission from further action in the premises. A demurrer was sustained to the petition, and, plaintiffs declining to plead further, their petition was dismissed, and they have appealed.

The title of the act reads:

> "An act enabling cities of the first class to construct, operate and maintain bridges across navigable streams, so as to connect such cities with an adjoining State; providing for a commission in such cities of the first class to construct, operate, control and maintain such bridges and fixing the powers and duties of such commission and providing for the issuance of revenue bonds of such cities to pay the cost thereof through bridge tolls without the incurrence of indebtedness of any such city."

Pertinent provisions of the act are:

> "Sec. 2. *Bridge Commission.* That the mayor of any city of the first class, with the approval of the legislative body of the city may appoint four persons, who, with the mayor ex officio, shall constitute a bridge commission. . . . The persons appointed as provided herein shall constitute a body corporate under the name (insert name of city) bridge commission and shall have power to contract and be contracted with, to sue and be sued in that name and to adopt a seal and alter same at pleasure."

Section 3 gives the commission full and ample authority to decide on the type of bridge, its location, and to acquire the necessary site; and to contract for its construction and equipment together with the purchase thereof, and to do all things necessary in the premises.

Section 4 authorizes the commission to purchase in the name of the Commonwealth of Kentucky any adjoining site of land, structures, rights of way, franchises, easement or other interests, in lands, including lands

under water and riparian rights of any person, railroad, or other private corporation or municipality necessary for the building of the bridge and its approaches, upon such terms as it deems reasonable, "title thereto to be taken in the name of the city."

Section 5 authorizes the condemnation of the property indicated in section 4 in this state, and to exercise in any adjoining state "such powers of eminent domain as may be conferred upon the commission by any act of Congress now in force or which may hereafter be enacted." Title to the property condemned to be taken in the name of the city.

Section 7 provides that the commission shall operate, manage, and control such bridges in its discretion, fix the rate of tolls, establish by-laws and rules and regulations for the use and operation of said bridges, and to select such employees as it deems necessary and fix their compensation.

Section 9 provides:

> "Nothing in this act contained shall be so construed as to authorize or permit any city to incur any indebtedness of any kind or nature as contemplated by the provisions of the Constitution of the commonwealth in relation to the indebtedness of cities. Cities of the first class are hereby authorized to provide funds for the purposes of this act by the issuance of revenue bonds of such cities by an ordinance or resolution of the commission and without a vote of the voters, the principal and interest of such bonds shall be payable solely from the special fund herein provided for such payment."

Provision is then made for 20-year 4½ per cent. revenue bonds, the form of which is to be provided by the commission, and which shall be signed by the chairman of the commission and by the chief executive officers of the city under the city's seal. Such bonds are exempt from taxation by the commonwealth and its municipalities. It is further provided that these may be sold by the commission when required for the payment of the cost of the bridge at not less than 92 cents on the dollar. The commission is further authorized to enter into an agreement with any trust company in the commonwealth as trustee for the bondholders. There is set forth the duties of the commission in the construction, maintenance, operation, and insurance of such bridges and con-

servation of the funds and insurance of moneys on hand or on deposit, the rights and remedies of the trustees and bondholders, restricting the individual right of action of the bondholders as is customary in trust agreements; and also embracing a provision for the approval by the original bond purchasers of the appointment of consulting engineers, and of the security given by the bridge contractors and by any bank or trust company, in which the proceeds, bonds, or bridge tolls or other moneys of the commission shall be deposited, and may provide that no contract of construction shall be made without the approval of the consulting engineers.

By sections 10 and 11 it is provided that the rate of tolls shall be fixed and adjusted as may be required by any law of the United States so as to provide a sufficient fund to pay the principal and interest of the bonds provided under the act, and providing an additional fund for repairing, maintaining, and operating such bridge, including costs of administration, etc. After the payment of operating expenses, such revenues are placed in a special fund charged with the payment of the bonds and interest. When the bonds and interest are fully paid the tolls shall cease, except for the cost of maintenance, repair, and operation, and, if the cost of operation is provided by other means, it shall become a free bridge. Upon the payment of all the bonds and interest, the city assumes the operation, maintenance, and repair of the bridge, and the commission is dissolved as is usual in cases of this character.

1. It is urged, first, that the title of the legislative act is in conflict with the provisions of section 51 of the Constitution. Without quoting the title a second time, we may say that we do not find any merit in this contention, and fully agree with the learned chancellor who said:

"I think there is nothing in the act which is not sufficiently indicated by its title, nor do I think that it can be said that the act deals with more than one subject. It undoubtedly deals with a great diversity of details connected with the execution of so large a project, but all of these matters are directly related to the general subject of an interstate bridge."

The next insistence is that the act is violative of various subsections of section 59 of the Constitution, in that

it (a) authorizes the opening of a highway; (b) because it grants a charter to a corporation; (c) because it licenses the operation of a bridge; (d) because it regulates tolls; (e) because it creates a lien upon the bridge revenue; and (f) it is the enactment of a special law where a general law could have been made applicable.

The cited section forbids the passage of local or special laws violating the subjects named, but, as the act relates to a municipality, it must be construed together with section 156 which provides:

"The cities and towns of this commonwealth, for the purposes of their organization and government, shall be divided into six classes. The organization and powers of each class shall be defined and provided for by general laws, so that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions."

It thus appears that, if the act is a general law within the purview of the latter section the provisions of section 59 do not apply to it. But appellants insist that the provisions for classification in section 156 are restricted to matters of organization and strictly governmental functions, and do not embrace quasi private municipal functions; that the latter are controlled by section 59 for which reason the power here attempted to be granted is forbidden. To this we cannot assent. True, in municipal affairs, there is a clear distinction between governmental powers which pertain to the state and partake of its sovereignty and purely municipal matters relating alone to the inhabitants of the city. See Board of Trustees Pension Fund v. Schupp, 223 Ky. 269, 3 S. W. (2d) 606. This distinction is most frequently drawn in cases under section 181 of the Constitution relating to taxation, and arises in some other cases. But so far as we are aware no distinction has been drawn under section 59 between acts granting governmental powers to municipalities and acts granting necessary incidental municipal powers. Section 156 classifies cities and towns according to their population and provides:

"The organization and powers of each class shall be defined and provided for by general laws."

The power thus "provided" is not confined to strictly governmental matters, the restriction being that

this shall be "by general law." And the language logically implies that each class may be granted such powers as are necessary or incidental to the proper conduct and control of its affairs. This is fully recognized in City of Louisville v. Kuntz, 104 Ky. 584, 47 S. W. 592, 20 Ky. Law Rep. 805, relied upon by appellants, in which it is said:

> "It is a recognized canon of construction that constitutional provisions should be construed so as to give force and effect to all of them, and this is done by limiting the legislature, in granting munici-pal charters, to the powers which are incident to, and necessary for, their organization and government, as pointed out by section 156."

True, it was there properly held that section 59 of the Constitution was violated by the provisions of an act relating to cities of the first class prescribing limitations in civil and criminal actions contrary to the statute. But, aside from being discriminatory, that legislation was not necessary or incidental to the control of government of the city; hence it is not authority on this point. Droege v. McInerney, 120 Ky. 796, 87 S. W. 1085, 27 Ky. Law Rep. 1137; James, Auditor, v. Barry, 138 Ky. 656, 128 S. W. 1070, and Stratman v. Com., 137 Ky. 500, 125 S. W. 1094, 27 L. R. A. (N. S.) 949, 136 Am. St. Rep. 299, were cases involving acts relating to section 59, and are relied on by appellants, but neither is in point, as the first two related to counties and the third to a *penal statute*, in none of which was section 156 involved. On the other hand, in Richardson v. Mehler, 111 Ky. 410, 63 S. W. 957, 23 Ky. Law Rep. 917, a city charter making certain exhibits prima facie evidence of regularity in all proceedings leading to the issual of apportionment warrants was held not to be in violation of section 59. And in Walston v. City of Louisville, 66 S. W. 385, 23 Ky. Law Rep. 1852, a special provision for interest upon delinquent city taxes embodied in the law applying to cities of the first class was upheld, the court saying:

> "A law for the government of cities is general when it applies to cities of a class."

The same principal was followed in Bryan v. Voss, 143 Ky. 422, 136 S. W. 884, where a commission form of government applicable to certain cities was authorized. And in Hager, Auditor, v. Gast, 119 Ky. 502, 84 S. W.

556, 27 Ky. Law Rep. 129, where street improvements assessed at the cost of the owner was upheld against the commonwealth.

We conclude that, even though the construction, operation, and control of a bridge by the city as here provided may not be the exercise of a governmental power in its strict sense, yet it is evident that such power is to be exercised for a public purpose, and that it is incidental to the government of the municipality, and, as it is granted to all cities of the same class, it is not forbidden by subsection 29 of section 59 of the Constitution. Other matters mentioned, supra, as violating different subsections of section 59 are incidental to the main question discussed and concluded by the same reasons. Nor is this conclusion affected by the fact that there is but one city in the class affected by the legislation. Schupp case, supra; Woolley v. City of Louisville, 114 Ky. 556. 71 S. W. 893, 24 Ky. Law Rep. 1357; Hager v. Gast, supra; Jones v. Russell, 6 S. W. (2d) —, decided May 8, 1928; Com. v. Jarrett, 213 Ky. 618, 281 S. W. 805; Miller v. Wilson, 236 U. S. 373, 35 S. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F, 829; Com. v. Ward, 136 Ky. 146, 123 S. W. 673. Also it is evident that a bridge of this character could not be constructed and maintained by the smaller cities, and a general law applying to all is impracticable. Under such circumstances, it was for the Legislature to say which class or classes was entitled to the exercise of such power, even if it should appear that some other class might have been included.

4. It is next argued that the act creates an indebtedness of the city in excess of the constitutional limitation provided in sections 157, 158. As to this it will be noted that the act itself, the indenture agreement, and the bonds to be issued all specifically provide that the indebtedness shall be paid from a special fund derived from the tolls and revenues of the bridge; and that the city shall not incur any indebtedness or obligation thereby. Neither the bridge nor any of the real estate or appurtenances are put in lien to secure the payment of the bonds, and this question seems fully determined by the opinion in City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004, in which we said:

> "We have no difficulty in reaching the conclusion that the bonds which it is proposed to issue are not debts within the meaning of the Constitution, if

they are to be paid out of the income and revenue derived from the operation of the water-works plant. If the water-works system could be taken to discharge the debts, then the bonds would probably create a prohibited indebtedness.''

To the same effect see Castle v. City of Louisa, 187 Ky. 399, 219 S. W. 439; Crick v. Rash, 190 Ky. 820, 229 S. W. 63; Tarter v. Skaggs, 184 Ky. 58, 211 S. W. 203; Christman v. Wilson, 187 Ky. 644, 221 S. W. 198; City of Catlettsburg v. Self, 115 Ky. 670, 74 S. W. 1064, 25 Ky. Law Rep. 161; Adams v. City of Ashland, 80 S. W. 1105, 26 Ky. Law Rep. 184; Gedge v. City of Covington, 80 S. W. 1160, 26 Ky. Law Rep. 273; Shaver v. Rice, 209 Ky. 467, 273 S. W. 48; Turner v. Kelly, 217 Ky. 775, 290 S. W. 711.

But in the alternative appellants say that, if the bonds do not create a municipal indebtedness, and if default is made in their payment, the good faith of the city is impunged. Not so; no purchaser can labor under any misapprehension on this score, because, as above stated, the nonliability of the city and the fact that they are to be payable from a special fund is specifically set out, not only in the act and the trust agreement, but also on the face of the bonds themselves. It it further said that two elections have been held in the city of Louisville for the purpose of voting a bond issue for the construction of such bridge. The first, proposing a free bridge, was defeated by a decisive majority. The second, for the construction of a toll bridge, out of the proceeds of city bonds, received a majority vote, but failed to receive the necessary two-thirds majority. And that this was evidence that the people did not want a bridge, and for this reason the method of financing here adopted should be condemned by the court. We do not so construe the meaning of those elections. Evidently the voters did not propose to assume the burden of taxation for the construction of a free bridge nor to assume the risk of such indebtedness being paid from the revenues derived from the toll bridge. But this does not show that they are opposed to the construction of a toll bridge to be financed entirely from its own revenue and for which they would incur no indebtedness. Certainly it does not show a constitutional limitation.

It is next urged that the act violates section 181 of the Constitution (a) in delegating the power of taxation

(fixing tolls) to the commission;'' (b) that such taxes (toll) will fall upon persons not residents and citizens of the city of Louisville. But not so; the constitutional provisions, sections 157, 171, 172, 174, and 181, relate to taxes upon property, and not to bridge tolls. Tolls are not taxes, but are charges upon the privileges of using the bridge, and are analogous to special assessments levied on property for street improvements in consideration of special benefits or privileges thereby conferred, and which do not constitute a tax. Gosnell v. City of Louisville, 104 Ky. 201, 46 S. W. 722, 20 Ky. Law Rep. 519. Further, all patrons are treated alike, and pay the same considerations for the use; hence it is immaterial whether or not they are residents of the city. It follows that the act is not inimical to section 181.

Nor do we think the act confers legislative power upon the commission, in violation of section 160. The commission may be said to function as an administrative body to carry out the legislative intent, and in so doing it is necessarily vested with some discretion, including the fixing of tolls. Craig v. O'Rear, 199 Ky. 553, 251 S W. 828.

Appellant insists that the extraterritorial powers conferred upon the city by the two acts, state and federal, are invalid. In Smith v. City of Kuttawa, 222 Ky. 596, 1 S. W. (2d) 979, comformably to Rieser v. Ward, 193 Ky. 368, 236 S. W. 255, we held that although a municipality may not exercise the right of sovereignty outside of its corporate limits, it may *acquire* and *own* property outside of such limits to be used for legitimate city purposes. But appellants argue that such power is restricted to this state, and that such property cannot be acquired or owned in another state without its consent—citing Dodge v. Briggs (C. C.) 27 F. 160; Georgia v. Chattanooga, 264 U. S. 472, 44 S. Ct. 369, 68 L. Ed. 796; and Becker v. City of La Crosse, 99 Wis. 414, 75 N. W. 84, 40 L. R. A. 829, 67 Am. St. Rep. 874. Admittedly such view is correct in the absence of congressional action based on article 1, sec. 8 (commerce clause), of the Federal Constitution. Before such action, states have plenary power to construct bridges over navigable streams within their territory. (Willamette Iron Bridge Co. v. Hatch, 125 U. S. 12, 8 S. Ct. 811, 31 L. Ed. 629); and adjoining states may agree as to such bridges over navigable streams forming a boundary between them (Covington & C. Bridge Co. v. Kentucky, 154 U. S.

204, 14 S. Ct. 1087, 38 L. Ed. 962), and of course may refuse such consent. Along this line prior to 1899 numerous congressional acts, mostly of a private nature. were passed, together with some prohibitory legislation, and in 1906 a general act was passed defining such bridges as ''post routes,'' making the location, plans, and specifications subject to the approval of the Secretary of War, and giving that official supervision over toll rates. The Federal Act of February 25, 1928, relating to the Louisville bridge being in all respects in conformity therewith, as is the state act. While as above stated, subject to a prohibition against creating a nuisance, the states have plenary power to construct bridges over navigable streams within its boundary, or to agree or refuse to agree, with adjoining states for such construction over streams forming boundary lines, before and until congressional action, yet the absolute power of congress to legislate upon the subject has at all times been specifically recognized. See Stockton v. B. & N. Y. R. R. Co. (C. C.) 32 F. 9; Luxton v. North River Bridge Co., 153 U. S. 525, 14 S. Ct. 891, 38 L. Ed. 808; and Willamette Bridge case, supra. The principle being thus stated in the Luxton case:

''Whenever it becomes necessary, for the accomplishment of any object within the authority of Congress, to exercise the right of eminent domain and take private lands, making just compensation to the owners, Congress may do this, with or without a concurrent act of the state in which the lands lie. Van Brocklin v. Tennessee (Anderson). 117 U. S. 151, 154 (6 S. Ct. 670, 29 L. Ed. 845) and cases cited; Cherokee Nation v. Southern Kansas R. Co., 135 U. S. 641, 656 (10 S. Ct. 965, 34 L. Ed. 295.)

''From these premises, the conclusion appears to be inevitable that, although Congress may, if it sees fit and as it has often done, recognize and approve bridges erected by authority of two states across navigable waters between them, it may, at its discretion, use its sovereign powers, directly or through a corporation created for that object, to construct bridges for the accommodation of interstate commerce by land, as it undoubtedly may to improve the navigation of rivers for the convenience of interstate commerce by water.''

Since the enactment of the federal act of 1906 (34 Stat. 461), in Latinette v. City of St. Louis (C. C. A.), 201 F. 676, the city of St. Louis brought condemnation proceedings in the state of Illinois under the Missouri act authorizing the construction of a bridge and the federal act of 1906 to the same effect. The court said:

"That the construction and operation of the bridge across the Mississippi, so that the bridge should not obstruct navigation of the water way, and that the bridge and its necessary approaches might serve as a postroad and as a landway for interstate commerce, were national matters, that the nation had the right itself to build and maintain the bridge and approaches, and, for the purpose of acquiring land for the approaches, to exercise the power of eminent domain either directly or through a corporation created by it for that end, without the consent or over the objection of the state—are propositions too well settled to warrant elaboration or debate. Kohl v. U. S., 91 U. S. 367, 23 L. Ed. 449; California v. (Central) Pacific R. Co., 127 U. S. 39, 8 S. Ct. 1073, 32 L. Ed. 150; Luxton v. North River Bridge Co., 153 U. S. 525, 14 S. Ct. 891, 38 L. Ed. 808; Wilson v. Shaw, 204 U. S. 24, 27 S. Ct. 233, 51 L. Ed. 351. Contention is therefore narrowed to this: That Congress could not constitutionally select appellee as the agency through which a national power should be exercised. Nothing in the Constitution forbids the selection of a state corporation as a national agent. In reason the material thing is the principal's authority, not the parentage of or birthplace of the agent. And the decisions of Mr. Justice Bradley at circuit in Stockton v. B. & N. Y. R. R. Co. (C. C.) 32 F. 9, and of the Supreme Court in Cherokee Nation v. Kansas Ry. Co., 135 U. S. 641, 10 S. Ct. 965, 34 L. Ed. 295, explicitly cover the point."

Further authorities upon the right of Congress to confer power upon state corporations and state officers to act for national purposes are Dallemagne v. Hoisan, 197 U. S. 169, 25 S. Ct. 422, 49 L. Ed. 709; U. S. v. Jones, 109, U. S. 513, 3 S. Ct. 346, 27 L. Ed. 1015. It appearing that it is not essential for the state Legislature to authorize its officers to so act; a matter not material here, as

the commission is granted such authority by the Legislature. See, also, Sou. Pac. R. R. Co. v. U. S. 183 U. S. 519, 22 S. Ct. 154, 46 L. Ed. 307, upon the same principle as holding that ''it is well settled that Congress has power to grant to a corporation created by a state additional franchises—at least franchises of a similar nature,'' and citing Sinking Fund cases, 99 U. S. 700, 25 L. Ed. 496; Pacific Ry. Removal cases, 115 U. S. 1, 5 S. Ct. 1113, 29 L. Ed. 319; California v. Central Pac. Ry., 127 U. S. 1, 8 S. Ct. 1073, 32 L. Ed. 150; U. S. v. Standford, 161 U. S. 412, 16 S. Ct. 576, 40 L. Ed. 751; Central Pac. Ry. Co. v. California, 162 U. S. 91, 16 S. Ct. 766, 40 L. Ed. 903.

The case of Becker v. City of La Crosse, supra, adopts the opposite view, but it is out of line with the federal cases cited, and was disapproved by Haeussler v. St. Louis, 205 Mo. 656, 103 S. W. 1034, which in turn is approved by McMurry v. Kansas City, 283 Mo. 479, 223 S. W. 615, and it may now be regarded as settled that the power thus vested in the city and commission is valid. Also for the reasons stated, supra, no conflict of sovereignty between the city of Louisville and the state of Indiana can arise; hence the Briggs and Chattanooga cases have no application. It follows that neither the state nor the federal act is invalid in this respect.

It is strongly argued that a sale of the bonds below par is a violation of section 193 of the Constitution, which forbids a corporation to issue stocks or bonds except for an equivalent in money, property, or labor or to receive money or property or equivalent thereof at a greater value than its market price. As explained in Carrollton F. M. Co. v. City of Carrollton, 104 Ky. 525, 47 S. W. 439, 885, sections 190 to 208, inclusive, of the Constitution relate to private corporations only. The bonds in question are bonds of the city of Louisville, albeit they are paid from a special fund. The bridge is to be the property of the city from the beginning. The commission, though a body corporate, has neither stock nor stockholders; pays no dividends, and functions only as the agent of the city; and will cease to function upon final payment of the bonds used in its construction. As the corporation functions merely as a municipal agent, it is quasi public in its nature, and is not controlled by the provisions of section 193.

Complaint is made that the act exempts the bonds from state and municipal taxes. The Constitution provides:

"There shall be exempt from taxation public property used for public purposes." Section 170.

"Bonds of the state, of the counties, municipalities and taxing and school districts shall not be subject to taxation." · Section 171.

As the construction and maintenance of the bridge is for public purposes and the bonds are municipal, the Legislature may pass a general act applying to all cities of this class making such exemption.

Section 9 of the act provides:

" . . . The commission may enter into an agreement with any trust company in the commonwealth as trustee for the holder of such bonds, setting forth the duties of the city and the commission in respect of the construction, maintenance, operation and insurance of any such bridge, the conservation and application of all funds, the insurance of moneys on hand or on deposit and the rights and remedies of said trustees and the holders of such bonds, restricting the individual right of action of bondholders as is customary in trust agreements respecting bonds of corporations. Said trust agreement may contain such provision for protecting and enforcing the rights and remedies of the trustee and the bondholders as may be reasonable and proper, and also a provision for approval by the original bond purchasers of the appointment of consulting engineers and of the security given by the bridge constructors and by any bank or trust company in which the proceeds of bonds or bridge tolls or other moneys of the commission shall be deposited, and may provide that no contract for construction shall be made without the approval of the consulting engineers."

And these provisions are embodied in the trust agreement.

Appellants urge that this is an unlawful delegation of power to the trustee and to the purchasers of the bonds. But we do not think so. The stipulation is in conformity with the provisions of the act, and is a safeguard for the protection of all parties, and is no more

than is customary in similar trust indentures securing debentures or bonds of private corporations.

Other questions have been raised and considered, but none of them affects the result, and we do not consider them of sufficient importance to further extend the opinion in a discussion of them.

Wherefore, perceiving no error, the judgment is affirmed.