## Hughes v. State Board of Health et al.

(Decided June 21, 1935.)

LEE HAMILTON for appellant.

BAILEY P. WOOTTON, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

The General Assembly at its regular 1934 Session enacted chapter 141, p. 559, Session Acts 1934, section 2061a-33, Baldwin's 1934 Statutes Service. Reference is made to the Session Acts, supra, for the title, which is in question. It is recited that the property formerly known as Hazelwood Sanatorium and later as the State Tuberculosis Sanatorium had theretofore been conveyed to the commonwealth to be used for the care of persons afflicted with tuberculosis.

It was said that the buildings and equipment had become inadequate for that purpose, and further that the federal government through an agency had proffered aid in the erection of larger buildings and providing more adequate equipment. The preamble declared it to be the public policy of the commonwealth that the state board of health should use such and all means as it might command to relieve what was becoming an intolerable situation, due to the rapid spread of the dreaded disease.

The act authorized the board to borrow a sum of money not to exceed $250,000 to pay for the erection of suitable buildings, to provide adequate equipment, and to repay the debt on a self-liquidating plan. The board was empowered to execute its bonds, secured by a mortgage on the real estate, and a pledge of income to assure the payment of the loan. The act also provided that the interest on the proposed loan, not to exceed 5 per cent., should be paid by the treasurer of the state on warrants of the auditor.

On November 24, 1934, the appellant suing as a citizen and taxpayer, for himself and others similarly situated, naming as defendants the state board of health, filed a petition in equity in the Franklin circuit court seeking a declaration of rights of the parties. After essential qualifying allegations, the plaintiff set out in full the Act of the General Assembly, supra, and alleged that steps had been taken by the board looking to the securing of the proposed loan, by entering into negotiations with the PWA, with the result that that agency agreed to advance sufficient funds to carry forward the proposed plans.

The application to the PWA has been approved, and under the terms of the proposed agreement an allotment to the amount of $295,000 is to be made, the board issuing negotiable coupon bonds to the amount of $230,000 in denominations of $1,000, which are to mature beginning in 1937 and ending in 1960, with the rate of interest fixed at 4 per cent. It is also provided in the agreement that the government will grant to the board a sum equal to 30 per cent. of the entire cost of labor and materials, same to be paid in cash, by cancellation of bonds or interest coupons.

It is estimated that the grant will amount to approximately $82,000, which would leave the sum due to be paid by the borrower approximately $213,000, exclusive of interest, since the estimated cost of the project is to be $295,000. Exhibits filed with the petition set out in detail the cost of labor, material, and all incidental expenses. The general plan of perfecting the improvements is shown. The property was appraised at $238,498.30 as of July 1, 1932, and this appraisement has been accepted. By tables based on estimates, it is shown that on a basis of 75 per cent. occupancy the net income available for application to the debt would be

approximately $15,000 per year, and if perchance the occupancy should be 90 per cent., the available income would be approximately $19,000, in either instance an income sufficient to pay the debt, including interest.

After steps had been taken bringing the plans to a closing point, the suit was filed seeking to enjoin the board from further proceeding with the proposed project. The petition recites further each and every step taken, but it is alleged:

"[a] The title of the act does not measure up to the requirements of section 51 of the Constitution.

"[b] That the bonds issued under the act in question whereby the revenues of the Sanatorium and the real estate in question are pledged to secure the payment of bonds constitutes a debt against the commonwealth within the meaning of and prohibited by sections 49 and 50 of the Constitution.

"[c] That the provisions for the payment of interest by the commonwealth will constitute a debt against the commonwealth within the meaning of sections 49 and 50 of the Constitution, and becomes a recurring item in the budget of the commonwealth, therefore bondholders. would be entitled to a right of action against the state treasurer and the auditor to enforce the payment of such interest.

"[d] That the giving of the mortgage and attempted pledge of interest by the commonwealth is in violation of section 177 of the Constitution."

The board filed a demurrer to the petition which was sustained, and the plaintiff declining to plead further, his petition was dismissed over his objection, and the appeal is presented here for review. The court below wrote into the record a judgment as follows:

"[1] That the purpose of the act is adequately expressed in its title, and therefore section 51 of the Constitution is not violated.

"[2] That the bonds issued under the act to secure the mortgage indebtedness do not constitute a debt against the commonwealth within the meaning of sections 49 and 50 of the Constitution or either of them.

"[3] That the payment of interest by the commonwealth will constitute a debt against the commonwealth within the meaning of sections 49, 50 of the Constitution, but not in such an amount as to be prohibited by the Constitution, and it is further adjudged that the bondholders will have a right of action against state officers to enforce the payment of interest. This, however, would not be in violation of the Constitution.

"[4] That the giving of a mortgage, as is proposed, and the payment of interest by the commonwealth, are not violative of section 177 of the Constitution."

Taking up first the objection to the title of the act, we conclude that it is not in any way violative of section 51 of the Constitution, which provides that no act shall relate to more than one subject, and that such subject shall be expressed in the title. The title declares that the act is one for the benefit of the State Tuberculosis Sanatorium. It might have stopped at this point, and no one could say that anything contained in the act would have lacked full expression in the title. Everything contained therein was germane to the avowed intention of doing something to benefit a public institution. However, the title went further and described the method, manner, and means whereby the proposed benefits should be accomplished. The act cannot be said to embrace a multiplicity or even a duplicity of subjects. It is not required that an act split up the general subject into subdivisions and recite each and every detail. The only prerequisite is that the title must furnish a fair notification of the general subject to be considered by the lawmaking body.

Measured by every rule laid down by this court in many cases, pro and con, we are of the opinion that the objection that the title does not conform to section 51 of the Constitution is not well grounded. It may be added that we have not been referred to any decision which would throw doubt upon the question, while on the other hand reference may be had to the recent case of Talbott, Auditor, v. Laffoon et al., 257 Ky. 773, 79 S. W. (2d) 244, which is a comprehensive writing on this subject, and applied here sufficiently disposes of the objection raised.

Taking up next the question of the loan, we find that it is secured by a mortgage on the real estate and an expressed lien ''upon the moneys at any time in the sinking fund and/or the interest account and/or the reserve fund.'' We have here the question as to whether the execution of the mortgage and the issuance of bonds to secure the payment thereof constitutes a debt within the prohibitions of sections 49, 50, and 177 of the Constitution or any one or more of them.

It may be observed from a reading of the proposed agreement and attached schedules that it is the expressed intent and purpose of the instruments of writing, and likewise the intent of the parties, that the lender is to look alone to funds from operating receipts to liquidate the indebtedness. There is nothing contained in the act or in the set-up which in any way obligates the commonwealth to pay any part or portion of the bonds.

It is stated, and not denied, that the property conveyed to the board for the purposes mentioned is free from encumbrance. No tax levy will have to be made to meet the obligation created by the issuance of bonds. It is true that if the payments of the bonds are not met there may occur a foreclosure and consequent passing of the property to other hands, but should such be the case the commonwealth could not be sued to make good a possible deficiency judgment.

The sections of the Constitution, which it is claimed stand in the way of carrying out the project as is proposed, are sections 49, 50, and 177. The first-named section permits the Legislature to contract debts to meet casual deficits or failures in the revenue, but limits such contracting of debts, direct or contingent, single or in the aggregate to a maximum of $500,000, excepting from the limitation of power the right to borrow money to repel invasion, suppress insurrection, etc.

Section 50 of the Constitution provides that no act of the General Assembly shall authorize any debt to be contracted on behalf of the commonwealth, except for the purposes named in section 49, unless provision be made to levy and collect any annual tax to pay the interest stipulated, and to discharge the debt within thirty years, unless the proposal to contract such debt shall be submitted to the voters, and receive at such election a majority vote.

Section 177 of the Constitution prohibits the giving, lending, or pledging of the credit of the commonwealth to any individual, company, corporation, association, or municipality of the state, or the making of a donation to any company, corporation, or association.

We can see no substantial grounds upon which it can be argued successfully that the transfer of the property to the board, and the pledging thereof by the board to secure the government loan, creates a debt against the commonwealth in contravention of sections 49 nor 50 of the Constitution. Likewise section 177 is of no applicable effect, since there is no lending or pledging of credit to any individual or to any one of the bodies named in that section. This conclusion as respects section 177 applies with equal force to the item of interest hereinafter discussed. However, this particular point need not be elaborated to any extent, since the pledging of property of the state, particularly for the purpose of repayment of borrowed money, on what is known as the self-liquidating plan, has been fully approved. Estes v. State Highway Commission, 235 Ky. 86, 29 S. W. (2d) 583; Bloxton v. State Highway Commission, 225 Ky. 324, 8 S. W. (2d) 392; Klein v. City of Louisville, 224 Ky. 624, 6 S. W. (2d) 1104. In fact the plan was fully authorized, and its carrying out was held not to contravene the sections of the Constitution here invoked, long before the plan was generally known as the "self-liquidating plan." Christman v. Wilson, 187 Ky. 644, 221 S. W. 198.

The fact that the state donated the property to the appellee, was a mere formal matter, done so as to permit the transaction to be handled in the form of a trusteeship. As to the state's power to convey its properties in this respect, see 59 C. J., sec. 280; Rudacille v. State Commission, 155 Va. 808, 156 S. E. 829; Bartlett v. Crawford, 36 Ark. 637; Bilger v. State, 63 Wash. 457, 116 P. 19.

The trial court, as we have above indicated, held that the obligation for the payment of interest in the manner provided constitutes a debt against the commonwealth, within the meaning of the word "debt" as employed in the sections in question (49 and 50), but "not in such an amount as to be prohibited" by those sections.

Whether the obligation for the payment of interest is a debt within the meaning of section 49 we deem it unnecessary to decide. It is sufficient to say that it is not claimed that the state is otherwise indebted, and it is clear that if all the items of interest which the state may be required to pay are added together, the total will not exceed $500,000.

Judgment affirmed.

The whole court sitting.

Stites, Justice (dissenting).

I am unable to agree with that portion of the opinion of the court relating to the payment of interest on the bonds by the commonwealth. It has been held that the borrowing of money, even for governmental purposes, creates a debt within the meaning of sections 49 and 50 of the Constitution. Stanley, Governor, v. Townsend, 170 Ky. 833, 186 S. W. 941. This is obviously correct. It is immaterial whether it exceeds $500,000 or not. The debt is not contracted to meet a casual deficit or failure in the revenue, and under section 50 of the Constitution it cannot take effect until it has been submitted to the people at a general election. The metaphysics of various opinions has not changed the fundamental law as written. No one disputes the desirability—indeed necessity—of the purpose to be accomplished by the act herein involved, but in applying these constitutional provisions our motto should be "obsta principiis." Boyd v. United States, 116 U. S. 616, 635, 6 S. Ct. 524, 535, 29 L. Ed. 746.